Craig W. LEKUTIS, Appellee,

v.

UNIVERSITY OF OSTEOPATHIC MEDICINE AND HEALTH SCIENCES, College of Osteopathic Medicine and Surgery, An Iowa Corporation, Appellant.

No. 93–1029.

Supreme Court of Iowa.

Nov. 23, 1994.

Donald Wine and Diane M. Stahle of Davis, Hockenberg, Wine, Brown, Koehn & Shors, P.C., Des Moines, for appellant.

Roger J. Kuhle and John C. Burnett of Law Office of Roger J. Kuhle, P.C., West Des Moines, for appellee.

Considered by McGIVERIN, C.J., and LAVORATO, NEUMAN, ANDREASEN, and TERNUS, JJ.

NEUMAN, Justice.

This appeal concerns a scholastically gifted but behaviorally troubled young medical student whose aberrant personality led him to fail the transition from classroom to clinic. He challenged the school's dismissal and the district court ordered his reinstatement, finding the school's decision revealed a lack of

professional judgment. On our de novo review, we conclude otherwise and reverse.

Plaintiff Craig Lekutis enrolled in the College of Osteopathic Medicine and Surgery (COMS) of defendant University of Osteopathic Medicine and Health Sciences in August 1985. He held a degree in pharmacy from Ohio Northern University and had worked as a pharmacist since his graduation from that institution in 1979. By all accounts, Lekutis was exceptionally intelligent. He had achieved superior scores on his medical school entry examinations.

Near the end of his first academic year at COMS, however, reports surfaced concerning Lekutis' eccentric behavior. He gained the nickname "Jacket Man" among the students because of his habit of wearing a winter-type coat in class even on warm spring days. The associate dean of student affairs, Dr. Patricia Cottrille, requested that Lekutis submit to a psychiatric evaluation by Teresa Bylander, a staff psychiatrist. After meeting with Lekutis, Dr. Bylander reported that while he was alert and cooperative, "his affect was obviously inappropriate, often with bizarre facial expressions even during silence, which bordered on the autistic at times." He appeared anxious, and conceded that in his quest to perform academically at the top of his class he had experienced a good deal of anxiety. Further conversation revealed fragmented speech modulating (without apparent awareness) from a whisper to a shout, disassociative thinking, and obsessive concern over answers to unstructured questions. Standardized testing indicated "strong psychopathic tendencies and proneness to impulsivity and acting out when angry and under stress." Based on her examination, Dr. Bylander recommended a trial of medication to control what she perceived to be his emotional instability. Lekutis rejected that suggestion, as well as her alternate proposal that he seek a medical leave of absence from school. Lekutis concluded his final examinations, finishing at the top of his class.

Just before the start of the next academic year, in August 1986, Lekutis' father suffered a heart attack. The event prompted Lekutis to seek a one-year leave of absence, a request honored by Dr. Lawrence E. Jacobson,

dean of academic affairs. Lekutis soon began having second thoughts about taking the leave. His indecision led to a week of repeated conversations with Dr. Jacobson. At their final meeting, Lekutis perceived that the dean was retreating from his earlier assurance that Lekutis could return to his studies at anytime. Upset by this turn of events, Lekutis became irrational and refused to leave Dr. Jacobson's office. Dr. Bylander was summoned. She described Lekutis as "very upset," "disheveled," and "obsessive." The scene escalated into what became known as the "fifth floor incident." If not readmitted, Lekutis threatened, he would drive his car off a bridge. He was eventually removed from the building by Des Moines police and transported to Broadlawns Medical Center's psychiatric ward. After a short ·stay, he was discharged to his mother. She planned to take him back home to Ohio. At the airport Lekutis made such a scene about boarding the plane that his mother was forced to summon the police once again to take him back to Broadlawns. The clinical notes contain the following comment by Lekutis' attending physician:

> During this present admission, I have tried to point out to the patient that his compulsive striving makes medical school a great burden for him and I do think that he should seriously rethink whether he really wants to continue in medical school.

Following these events, Lekutis complied with the school's insistence that he take a one-year leave of absence. Readmission was conditioned on a positive medical evaluation and proof of regular psychiatric care. Lekutis met these requirements and completed his second year of studies without incident. Again he scored near the top of his class academically. In fact, he scored in the 99th percentile on the national boards for osteopathic students.

In their third year, osteopathic medical students begin clinical rotations. Although Lekutis had applied for and been accepted in clinical programs in Ohio, Dr. Jacobson insisted that he do his rotations at a COMS-affiliated clinic in Des Moines. This would provide continuity in Lekutis' psychiatric

care and enable the college to keep closer tabs on his performance.

Lekutis' first rotation was in family practice. Three weeks into the rotation the supervising physician, Dr. David Borchardt, met with Lekutis to discuss many weaknesses that had surfaced in his clinical skills. Areas needing improvement included Lekutis' dirty and unkempt appearance, poor history taking from patients, patient complaints about lack of confidence in him, a lack of tact, complaints by two female student doctors of unwelcome amorous advances, an inability or unwillingness to complete routine hospital forms and tasks, and his unusual habit of walking around "with his hands clasped over his abdomen" like a monk. The record reveals that many of Lekutis' clinical skills improved over the course of the rotation, but serious problems remained with respect to his "social functioning." Dr. Borchardt met with Lekutis several times to discuss these concerns.

Lekutis received a failing grade on the family practice rotation but, regrettably, he did not receive word of his failure or a copy of the written evaluation for over a month. In the meantime he began a series of rotations in five disciplines at Des Moines General Hospital. Lekutis failed both the internal medicine and pathology rotations there. His inability to interact appropriately with patients and staff was so disruptive that the hospital asked that he be terminated immediately without attempting the other three rotations.

The parties dispute whether at this point Lekutis was given the option of taking another medical leave or whether Dr. Jacobson ordered him to remediate his deficiency in the family practice rotation. In any event he undertook a second family practice rotation under the supervision of Dr. Nancy Akins. Dr. Akins and another doctor met with Lekutis early in the rotation to discuss their expectations. Akins reported that Lekutis seemed unable to identify the performance weaknesses that had led to his prior failure. Halfway through the rotation it became apparent to Dr. Akins that Lekutis would again fail. An interim evaluation revealed below average scores on a range of evaluated skills.

Two weeks later she advised the associate dean of students that Lekutis' performance did not approach the "minimal standards for a typical student of the fourth-year level." She reported moreover that his attempt at behavior modification—mimicking supervisory doctors and repeatedly referring to a folded paper in his pocket listing faculty's suggested improvements—had merely caused additional disturbance among both patients and staff. Dr. Akins reviewed her position with Lekutis and advised that he withdraw from the rotation and take an incomplete rather than face certain failure and dismissal. Lekutis did not ask to withdraw and he was dismissed from the college.

Lekutis unsuccessfully appealed his dismissal through university channels before proceeding to district court. His petition asserted that the college's decision to dismiss him breached an express and implied contract to provide the instruction and clinical training necessary to complete his osteopathic medicine studies. He further claimed that the school had imposed unreasonable and capricious requirements upon him, all of which resulted in economic damages, diminished professional opportunities, and additional educational expenses. He sought reinstatement to COMS, full restitution of tuition paid or incurred in the future, and an award of consequential damages.

The case was tried to the court in equity. In a thoughtful and lengthy opinion, the district court concluded that school administrators had fostered an atmosphere of prejudice against Lekutis, violated written procedures concerning evaluations and remediation of failed rotations, and generally failed to exercise the level of professional judgment demanded of such situations. Acknowledging that mental instability may ultimately prevent Lekutis from adequately performing in a clinical setting, the court nevertheless ordered the college to reinstate him as a student in good standing and offer him "a full and fair opportunity to repeat the family practice clinical rotation." It is from this ruling that COMS has appealed.

I. *Scope of Review.*

■ This case was tried in equity and, accordingly, our review is de novo. *Pflepsen*

*v. University of Osteopathic Medicine,* 519 N.W.2d 390, 391 (Iowa 1994). We give weight to the trial court's findings of fact, particularly on questions of witness credibility, but we are not bound by them. Iowa R.App.P. 14(f)(7).

## II. *Standard Applicable to Student Dismissal.*

■ At the heart of this appeal is COMS' contention that the district court, while recognizing that Lekutis' dismissal was for academic failure, failed to apply the deferential standard customarily accorded such decisions. Lekutis responds by questioning the nature of the dismissal, quoting the district court's observation that the case has "both academic and non-academic overtones." He then suggests that COMS' reliance on academic failure is pretextual and that standards applicable to the trial of ordinary contract disputes should apply.

First, we reject Lekutis' characterization of his dismissal as nonacademic. This court recently observed that "[p]ractical aspects of professional training and discipline, especially in the health sciences, are a part of the student's academic training." *Pflepsen,* 519 N.W.2d at 392. The fact that Lekutis' failure stemmed from gross lack of interpersonal skills, rather than any intellectual deficit, in no way alters the nature of the inquiry. It is well settled that in a medical education,

> evaluation of [the student's] performance in [clinical courses] is no less an "academic" judgment because it involves observation of . . . skills and techniques in actual conditions of practice, rather than assigning a grade to written answers on an essay question.

*Board of Curators of the Univ. of Missouri v. Horowitz,* 435 U.S. 78, 95, 98 S.Ct. 948, 957, 55 L.Ed.2d 124, 138 (1978) (Powell, J., concurring); *see Lunde v. Iowa Bd. of Regents,* 487 N.W.2d 357, 362 (Iowa App.1992).

■ Satisfied that Lekutis' dismissal was based on academic performance, we turn to COMS' complaint that the court failed to apply the correct standard of review. The assignment is not without merit. The court's opinion recited that it "will not interfere unless Lekutis proves by a preponderance of the evidence COMS' administration failed to exercise professional judgment in his dismissal." The actual standard, however, more severely circumscribes the court's authority:

> When judges are asked to review the substance of a genuinely academic decision, such as this one, they should show great respect for the faculty's professional judgment. Plainly, they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment.

*Regents of Univ. of Michigan v. Ewing,* 474 U.S. 214, 225, 106 S.Ct. 507, 513, 88 L.Ed.2d 523, 532 (1985); *accord North v. State,* 400 N.W.2d 566, 571 (Iowa 1987); *Lunde,* 487 N.W.2d at 362. To the extent that the court's abbreviated expression of the rule effectively lowered Lekutis' burden of proof, the court was in error.

## III. *Sufficiency of the evidence.*

■ COMS contends that crucial fact-findings made by the court are unsupported by the evidence. These mistakes, COMS argues, led the court to erroneous conclusions about the college's decision. We agree. Applying the *Ewing* standard on our de novo review, we are convinced that COMS' action neither substantially departed from accepted academic norms nor demonstrated an absence of professional judgment.

The trial court found COMS' administrators "fostered an atmosphere of prejudice against Lekutis" and permitted staff to participate in a "rumor mill" about him following the fifth-floor incident. This criticism appears to us unfounded. We believe the record reveals genuine concern by administrators over Lekutis' welfare and his professional future. Dr. Jacobson's correspondence with Lekutis, both following his medical leave and upon completion of his second year of academic work, congratulate him on his success and offer assistance with any future problems. As for staff's alleged failure to stifle student rumors or use of the "Jacket Man" nickname, common sense dictates that an administrative attempt to address the

problem would have served only to magnify it.

The record does support the court's finding that Lekutis' reputation preceded him. Standing alone, however, that fact does not support the court's conclusion that Lekutis thereby failed to receive the "fresh start" in clinical rotations that he deserved. We believe the record as a whole demonstrates that his clinic instructors were as eager to pass as to fail him. They were simply stymied, in Dr. Borchardt's words, by Lekutis' inability to appropriately deal with patients and staff in "ordinary simple situations that we all take for granted."

The district court also placed great weight on COMS' alleged violation of student handbook policies relative to authorized clinical rotation sites and faculty evaluations. As already noted, Lekutis had hoped to do his clinical work in Ohio. COMS' denial of his request—a matter characterized by the court as contrary to written rules—in fact conforms to a handbook policy that reserves decision on "location and sequence of all rotations" to the academic administration. As for the court's criticism of Dr. Borchardt's and Dr. Akins' failure to follow written policy concerning student evaluations, we seriously doubt whether more thorough or more timely documentation of Lekutis' deficiencies would have altered the course of events. The record, both oral and written, reveals repeated attempts by faculty to counsel Lekutis and offer constructive criticism. These efforts were largely unsuccessful. In retrospect, they could perhaps have been more prompt and precisely detailed. In no event, however, do the filed reports suggest less than a deliberate, considered review of Lekutis' strengths and weaknesses as observed by the evaluators on a daily basis over many weeks. We find no evidentiary support for the trial court's conclusion that COMS was attempting to "get rid of Lekutis" without justification.

Finally, we fail to find evidentiary support for the court's conclusion that Dr. Jacobson set Lekutis up for failure in the second family practice rotation. The conclusion seems to rest on findings that Jacobson insisted that Lekutis enroll immediately—despite Dr. By-

lander's contrary recommendation—and that Lekutis was disadvantaged because the rotation had already begun. The record reveals, however, that Dr. Jacobson complied with student handbook policy by assigning Lekutis to the next available rotation. The speed with which he was placed resulted from Lekutis' own dismal failure and premature termination from his hospital rotations. Moreover, his claim that he started seven weeks "behind" is contradicted by testimony that family practice clinic students can rotate in at any time and thereafter successfully complete the rotation's seventeen-week course.

In conclusion, we do not find in this record evidence even close to the "substantial departure from accepted academic norms" that would authorize a court to upset a considered academic judgment. We find ample evidence that, over the course of three years, COMS evaluated Lekutis' fitness to practice medicine and found him grossly lacking in the crucial area of patient care. It was wise—not arbitrary—for the school to recognize his failures and hold him accountable for them despite an outstanding record in his didactic studies. We therefore reverse the judgment of the district court and remand for entry of judgment dismissing Lekutis' claims against COMS and the university.

**REVERSED AND REMANDED WITH INSTRUCTIONS.**