## SHAILESH GUPTA v. NEW BRITAIN GENERAL HOSPITAL
### (15487)

Borden, Katz, Palmer, McDonald and Peters, Js.

Argued October 30—officially released December 31, 1996

*William A. Wechsler*, for the appellant (plaintiff).

*Theodore J. Tucci*, with whom was *Alicia B. Davenport*, for the appellee (defendant).

PETERS, J. The principal issue in this case is the proper characterization of a residency agreement pursuant to which a surgical resident was dismissed during the final year of his residency training program. The plaintiff physician, Shailesh Gupta, alleging that he had entered into an employment contract with the defendant, New Britain General Hospital (hospital), brought an action challenging the propriety of his dismissal from the hospital's residency training program. The trial court granted a motion for summary judgment filed by the hospital. The plaintiff appealed from the judgment of the trial court to the Appellate Court. We transferred

the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c) and now affirm the judgment of the trial court.

Because this appeal arises from the granting of summary judgment in favor of the hospital, our review proceeds from a view of the facts in the light most favorable to the plaintiff. See, e.g., *Strada* v. *Connecticut Newspapers, Inc.*, 193 Conn. 313, 317, 477 A.2d 1005 (1984). In July, 1985, the hospital appointed the plaintiff to serve as a resident physician in the second year of its five year[1] general surgical residency program.[2] Accordingly, the plaintiff and the hospital entered into a Resident Physician Agreement (residency agreement),[3] which

---

[1] Because the plaintiff had completed a prior year of residency work at another hospital, in Cleveland, Ohio, he joined the hospital's program as a second year resident.

[2] Generally, medical school graduates participate in a hospital based residency program in order to train in certain specialty or subspecialty areas. See Dorland's Illustrated Medical Dictionary (27th Ed. 1988) p. 1448. Successful completion of a residency program is a prerequisite for board certification in particular specialties. See, e.g., S. Reuter, "Professional Liability in Postgraduate Medical Education," 15 J. Legal Med. 485, 486 (1994). Under Connecticut law, it is necessary to complete no less than two years of accredited residency program work in order to obtain a license to practice medicine or surgery. See Public Acts 1995, No. 95-271, § 1; General Statutes § 20-13.

[3] The agreement provided in relevant part:

"RESIDENT PHYSICIAN AGREEMENT

(Residents, Interns and Fellows)

THIS AGREEMENT has been entered into on July 1, 1985 between NEW BRITAIN GENERAL HOSPITAL, a Connecticut corporation having its principal office at 100 Grand Street, New Britain, Connecticut (the 'Hospital'), and Shailesh Gupta, M.D., residing at 1890 Surrey Place, Gates Mills, OH 44040 (the 'Physician').

The Physician has been duly appointed to serve as a(n) PGY-II in the Hospital's General Surgical Residency program (the 'Program') during the period from July 1, 1985 through June 30, 1986. The Program will be conducted under the general supervision of the Chief of Surgery (the 'Program Director'). This Agreement will set forth the respective rights and duties of the parties as participants in the Program.

IN CONSIDERATION OF their mutual promises and undertakings, the parties to this Agreement hereby agree as follows:

(1) The Program.

The general objectives of the Program are to provide to the Physician a proper educational experience in the professional field encompassed by the

described the objectives of the residency program and specified the mutual obligations of the plaintiff and the hospital. The residency agreement remained in effect

Program while simultaneously providing to the Hospital's patients a high quality of health care. The Hospital represents that the Program is, and will continue to be, properly accredited by all necessary accrediting authorities. The Hospital will maintain its staffing and facilities so as to maintain such accreditation and to provide a proper educational setting for the Program. The Physician's duty time in the Program will be scheduled by the Program Director with due regard for the needs of Hospital patients and the educational interests of the Physician.

The Program covered by this Agreement is a part of an overall program of education provided at the Hospital. If the Program is not the concluding part of such an overall program and if the Physician successfully fulfills his or her obligations under this Agreement during the Program period and is recommended for advancement by the Program Director, the Hospital will renew this Agreement for the subsequent part of the overall program upon terms to be agreed upon at the time of renewal. If the Program is the concluding part of such an overall program and if the Physician successfully fulfills his or her obligations under this Agreement during the Program period, the Hospital will certify in proper fashion that the Physician has successfully completed the overall Program. . . .

(2) Obligations of the Physician.

The Physician agrees to fulfill all educational requirements of the Program and further to provide safe, effective and compassionate health care to Hospital patients during the Program period. Furthermore, the Physician shall comply with all laws, bylaws, rules, regulations and policies to which the Hospital is subject or which the Hospital shall from time to time adopt and shall exhibit professional conduct at all times while on duty or engaged in any activity under the auspices of the Hospital. The Physician shall comply with all proper directives and instructions of the Program Director.

During the term of this Agreement, the Physician will be a member of the Hospital's Medical Staff, having all of the rights and responsibilities attendant upon such membership as set forth in the Hospital and Medical Staff Bylaws or as modified by this Agreement. Subject to prior approval by the Program Director, the Physician may engage in any outside activity which does not interfere with his or her obligations under this Agreement.

(3) Compensation and Benefits.

During the Program period, the Physician will be paid a weekly salary at a rate of $22,800.00 per year. Salary increments will be provided at the time of renewal of this Agreement or otherwise in accordance with general Hospital policy from time to time in effect. The Hospital will provide to the Physician such insurance coverage and other benefits as are set forth in the Hospital's general schedule of employee benefits from time to time in effect. The Physician acknowledges that professional liability insurance

for a term of one year only, subject to possible renewal in one year increments upon favorable evaluation of the plaintiff by faculty members in the hospital's department of surgery.

Shortly after the renewal of the plaintiff's residency agreement for a second year, supervising faculty at the hospital and elsewhere[4] began to express concerns whether the plaintiff would be able to complete his residency citing deficiencies in his clinical skills and in his ability to interact with staff members. These doubts led to the hospital's decision to place the plaintiff on probation at the time of the renewal of his residency agreement for a third year beginning in July, 1987.

In February, 1988, during the plaintiff's third year at the hospital and while he was still on probation, the hospital's resident evaluation committee (residency committee) preliminarily determined that there had been insufficient improvement in the plaintiff's clinical performance to justify renewal of his residency

coverage provided by the Hospital will not extend to any of the Physician's activities outside of the Program.

Except as otherwise expressly stated in this Section 3, the Physician will be entitled to such holidays, vacation time and leaves of absence as may be set forth in the Hospital's general schedule of employee benefits. The scheduling of any holidays, vacation time or leaves of absence for the Physician shall be subject to the prior approval of the Program Director having due regard for patient coverage, rounds, on-call requirements and educational requirements of the Program. The Hospital shall reimburse the Physician for qualifying educational expenses in the aggregate amount of $0.00 incurred during the Program period. . . .

IN WITNESS [WHEREOF], the Hospital and the Physician have duly executed this House Staff Physician Agreement as of the day and year first set forth above. . . .

NEW BRITAIN GENERAL HOSPITAL
s/ Gerald D. Strauch, M.D.
PHYSICIAN
s/ Shailesh Gupta, M.D. (L.S.)
7/2/85"

[4] The plaintiff had "rotated out" to other hospitals, including the Shriners Burns Institute in Boston and the University of Connecticut Health Center.

agreement for a fourth year. The plaintiff was so warned. The committee decided, however, to defer actual termination of the plaintiff's residency for another ninety days, beginning in March, 1988.

Despite continued doubts as to the plaintiff's performance during this ninety day period, the residency committee nonetheless decided, in July, 1988, by one vote, to renew the plaintiff's residency agreement for a fourth and final year.[5] The committee imposed four specific conditions on the plaintiff's renewal as a resident: (1) the plaintiff had to spend the entire year at the hospital, rather than rotating out to other facilities; (2) the plaintiff could supervise a junior resident in the operating room only if an attending surgeon was also present; (3) the plaintiff was required to obtain professional counseling; and (4) the general surgical section would evaluate the plaintiff's performance on a quarterly, rather than an annual, basis.

At the plaintiff's first quarterly evaluation in September, 1988, the general surgical section unanimously determined that the plaintiff did "not show any potential for being a safe and independent surgeon" and so decided to dismiss him. This determination was based on a number of factors, including the plaintiff's inability to make decisions in the operating room, his unwillingness to accept responsibility for errors, and gaps in the plaintiff's "knowledge base." The plaintiff was informed of his immediate dismissal from the residency program.

The plaintiff, with the assistance of counsel, exercised all the procedural rights of review afforded to him under the hospital's bylaws. His dismissal was affirmed, first by an ad hoc committee of the medical staff and,

---

[5] In his affidavit, the plaintiff states that he was the only resident promoted to the final year of the program.

thereafter, by the hospital's appellate review committee.[6]

After various unsuccessful efforts to challenge his dismissal as a violation of his civil rights[7] and as a result of discriminatory practices,[8] the plaintiff filed the present action seeking damages because of alleged breaches of the residency agreement by the hospital. The plaintiff's complaint alleged that his dismissal violated the residency agreement because the hospital had: (1) failed to honor the obligations inherent in the residency agreement as a contract of employment; (2) failed to provide proper training facilities as required by the residency agreement; (3) acted arbitrarily, capriciously or in bad faith; and (4) violated an implied covenant of good faith and fair dealing.

The hospital moved for summary judgment, which the trial court granted.[9] The court concluded that because "the consistent purpose of the [residency] agreement [was] to provide an educational opportunity," the plaintiff and the hospital had entered into an educational, rather than employment, relationship. The

---

[6] In this litigation, the plaintiff has not challenged the adequacy of these procedures.

[7] The plaintiff's action for injunctive relief, filed first in state court, was removed by the hospital to federal court because the plaintiff had sought relief, in part, under 42 U.S.C. § 1983. The federal court dismissed the § 1983 claim and remanded the case to state court. After a hearing, the Superior Court, *O'Neill, J.*, denied the plaintiff's request, and the Appellate Court dismissed his appeal for lack of a final judgment. That action was subsequently dismissed for failure to prosecute. The plaintiff's attempt to revive it under the accidental failure of suit statute; General Statutes § 52-592; was dismissed as untimely.

[8] The Equal Employment Opportunity Commission dismissed, for lack of evidence, his claim that the hospital had discriminated against him. A federal court action was similarly dismissed.

[9] The trial court first determined that the plaintiff's contract claims were properly before the court despite the plaintiff's earlier pursuit of other judicial remedies related to his discharge. The hospital does not challenge this determination.

court, therefore, characterized the decision to dismiss the plaintiff as an academic decision that lay "solely within the province of the medical community." With respect to the plaintiff's claim that the hospital's residency program was unreasonable or inadequate, the trial court held that, "without a factual basis," the plaintiff had failed to state a cause of action for breach of contract on this ground. In the absence of evidence that the hospital had acted "arbitrarily, capriciously or in bad faith," the trial court held that the plaintiff's dismissal was not a breach of the residency agreement. The trial court did not address explicitly the plaintiff's claim that, in dismissing him, the hospital had violated a covenant of good faith or fair dealing.

On appeal, the plaintiff renews the claims that he made at trial, adding only that the trial court overlooked genuine issues of material fact in granting summary judgment. "The standards governing our review of a trial court's decision to grant a motion for summary judgment are well established. Practice Book § 384 provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." (Internal quotation marks omitted.) *Doty* v. *Mucci*, 238 Conn. 800, 805, 679 A.2d 945 (1996). Applying these standards, we reject the plaintiff's claims and affirm the judgment of the trial court.

I

In the plaintiff's principal challenge to the trial court's decision upholding his dismissal, he takes issue with the court's characterization of the nature of the residency agreement. He contends that the court improperly determined that, as a matter of law, the residency agreement gave rise to an educational, rather than

employment, relationship and, therefore, mischaracterized his dismissal as an academic decision, to which courts should normally defer, rather than a termination of employment, which would have limited the scope of the hospital's discretion. We agree with the trial court's characterization of the residency agreement.

A proper assessment of the nature of the plaintiff's employment status must take into account the language of the residency agreement as well as any circumstances that might illuminate our interpretation of this language. On the present record, despite the plaintiff's argument to the contrary, this assessment is purely a question of law.

The plaintiff contends that the parties, by emphasizing different portions of the residency agreement that favor their respective interpretations of that agreement, implicitly demonstrated that material facts were in dispute. These "facts," he contends, were not properly considered by the trial court in its decision to grant summary judgment. We disagree.

It is well settled that, for purposes of summary judgment, the moving party "has the burden of showing the absence of any genuine issue [of] material facts which, under applicable principles of substantive law, entitle him to a judgment as a matter of law . . . and the party opposing such a motion *must provide an evidentiary foundation* to demonstrate the existence of a genuine issue of material fact." (Citations omitted; emphasis added; internal quotation marks omitted.) *Doty* v. *Mucci*, supra, 238 Conn. 805–806. Merely alluding to disputed material facts, however, without providing substantiation, does not sufficiently establish those facts to preclude summary judgment. See, e.g., *Strada* v. *Connecticut Newspapers, Inc.*, supra, 193 Conn. 317.

The plaintiff has failed to identify any disputed issues of material fact relevant to the characterization of his

relationship with the hospital or his subsequent dismissal from the residency program. Moreover, he has offered no evidence that the parties' relationship should be interpreted by reference to conditions, statements, or any other circumstances not contemplated by the language of the residency agreement. Cf. *Banerjee* v. *Roberts*, 641 F. Sup. 1093, 1105–1106 (D. Conn. 1986) (question of fact arises with respect to resident's relationship with hospital where extrinsic statements made regarding terms of residency); *Torosyan* v. *Boehringer Ingelheim Pharmaceuticals, Inc.*, 234 Conn. 1, 13–14, 662 A.2d 89 (1995) (implied employment contract inferable from words spoken between parties). The plaintiff's own affidavit, which was the only evidence proffered in opposition to the hospital's motion for summary judgment, merely lists some of the "non-educational, service oriented tasks" that the plaintiff performed during his residency. Because the plaintiff's performance of these tasks is *undisputed*, this evidence does not give rise to a question of fact regarding the proper characterization of his relationship with the hospital with respect to his dismissal for his professional failings. The plaintiff's conclusory statements, in the affidavit and elsewhere, that he and the hospital had entered into an "employment contract" do not constitute evidence sufficient to establish the existence of disputed material facts. See *Wadia Enterprises, Inc.* v. *Hirschfeld*, 224 Conn. 240, 250, 618 A.2d 506 (1992).

In the absence of any question of fact, the proper characterization of the residency agreement, as a matter of law, implicates a number of factors, including the language of the agreement, the purpose of the parties in entering into the agreement, and the institutional setting of the agreement. With respect to the dismissal of a resident based on his failure to attain the necessary level of clinical competence, we agree with the trial court that an analysis of these factors, in their entirety,

compels the conclusion that the hospital's decision to dismiss the plaintiff was an educational and not an employment decision.

The language of the residency agreement bears many indicia of a contract for educational services. In its first sentence, the agreement provides that "[t]he general objectives of the Program are to provide to the Physician a *proper educational experience* in the professional field encompassed by the Program while simultaneously providing to the Hospital's patients a high quality of health care." (Emphasis added.) The agreement further provides that "[t]he Program covered by this Agreement is a part of an *overall program of education* provided at the Hospital." (Emphasis added.) To facilitate this learning experience, the hospital promises to "maintain its staffing and facilities so as . . . to provide a *proper educational setting* for the Program." (Emphasis added.)

Other parts of the residency agreement contain provisions, however, that are indicative of an employer-employee relationship. Thus, the agreement provides that the plaintiff "will be paid a weekly salary at a rate of $22,800.00 per year" and that "[t]he Hospital will provide to the Physician . . . insurance coverage and other benefits . . . ." The agreement assures the plaintiff that he will receive "such holidays, vacation time and leaves of absence as may be set forth in the Hospital's general schedule of employee benefits." The agreement promises that the plaintiff, during his term at the hospital, "will be a member of the Hospital's Medical Staff, having all of the rights and responsibilities attendant upon such membership . . . ."

The trial court concluded that, despite the employment aspects of the residency agreement, its "consistent purpose" was "to provide an educational opportunity." Implicitly drawing on cases in which

courts have had to decide whether residents are "students" or "employees" for the purpose of collective bargaining,[10] the trial court found that the primary purpose of this contract was educational because, in the court's view, "without the educational component of the [agreement], the plaintiff would/could not have participated" in the residency program. Having thus discerned the agreement's primary purpose, the court concluded that the hospital's decision to dismiss the plaintiff was a proper exercise of its academic responsibility for residency training.

Although we agree with the trial court's ultimate conclusion, we are not persuaded that a singular search

---

[10] In the statutory context of labor laws governing collective bargaining, some courts, focusing on the subjective intention of residents, have held that residents are not employees because they choose to serve at a hospital for educational reasons and not for monetary remuneration. See *Cedars-Sinai Medical Center*, 223 N.L.R.B. 251, 253, 91 L.R.R.M. 1398 (1976); see also *Philadelphia Assn. of Interns & Residents* v. *Albert Einstein Medical Center*, 470 Pa. 562, 568–69, 369 A.2d 711 (1976). Other courts, looking more to the objective characteristics of the residency relationship in its entirety, have considered such residents to be employees. See, e.g., *Regents of the University of California* v. *Public Employment Relations Board*, 41 Cal. 3d 601, 618–20, 715 P.2d 590, 224 Cal. Rptr. 631 (1986); see also *Regents of the University of Michigan* v. *Michigan Employment Relations Commission*, 389 Mich. 96, 110–12, 204 N.W.2d 218 (1973).

These precedents are of limited relevance for two reasons. First, the mission of the courts in these cases was one of statutory construction and, accordingly, centered on ascertaining the intent of their respective legislatures. See, e.g., *House Officers Assn.* v. *University of Nebraska Medical Center*, 198 Neb. 697, 703–704, 255 N.W.2d 258 (1977) (state legislature intended residents to be included as employees). Second, because the statutes at issue required a definitive categorization of the status of residents, both the subjective and the objective tests were designed to yield a categorical answer to the question of whether residents serve as employees or as students. See *Regents of the University of Michigan* v. *Michigan Employment Relations Commission*, supra, 389 Mich. 112 (observing that employee and student categories are not "mutually exclusive" but nonetheless affirming residents' status as employees). Proper characterization of the residency agreement in this case does not require us to adopt a monochrome vision of the resident as either student or employee under any or all circumstances.

for the primary purpose or purposes of the parties is determinative of the rights of the parties in this case. On its face, the residency agreement created a hybrid relationship containing both employment *and* educational features. See *Regents of the University of Michigan* v. *Michigan Employment Relations Commission*, 389 Mich. 96, 112, 204 N.W.2d 218 (1973) ("residents . . . are both students and employees"); *House Officers Assn.* v. *University of Nebraska Medical Center*, 198 Neb. 697, 701–702, 255 N.W.2d 258 (1977) (same); *Seare* v. *University of Utah School of Medicine*, 882 P.2d 673, 677 (Utah App. 1994), cert. denied, 892 P.2d 13 (Utah 1995) (noting existence of "two types of relationships" in a residency program: employment and education). Because of the hybrid nature of the residency agreement, we conclude that the agreement is more properly interpreted, under any particular set of circumstances, by a functional analysis of its terms in relationship to the nature of the alleged breach, rather than by an overarching search for the purpose or purposes of the parties.[11] See *Ross* v. *University of Minnesota*, 439 N.W.2d 28, 32 (Minn. App. 1989) ("[w]hether the resident is considered an employee or a student depends on the context in which the question [and a cause of action] arises").

In this case, the plaintiff was dismissed as a result of the hospital's decision that he was not then, and would not likely become, a safe and independent surgeon. Such a decision has little to do with the normal

[11] Arthur Corbin commented perceptively on the utility of a judicial search for the principal purpose of a contract when he wrote: "How is a court to discover what was the principal purpose of the parties or whether they had any? It is certain, in practically all business transactions, that they had different purposes, at least in part. Their principal purpose, or their separate and diverse purposes, can not be determined by a process that is wholly independent of the words of the agreement." 3 A. Corbin, Contracts (1960) § 545, p. 160.

attributes of an employee relationship.[12] It implicates, instead, the academic core of the residency agreement. See *Ross* v. *University of Minnesota*, supra, 439 N.W.2d 33.

A residency training program provides medical school graduates with the clinical training necessary for board certification in specialty or subspecialty areas. See footnote 2. A residency is, in many respects, part of an educational continuum begun in medical school. See S. Reuter, "Professional Liability in Post-graduate Medical Education," 15 J. Legal Med. 485 ("[r]esidents are physicians in transition"). The ultimate objective of the residency program is to educate the physician in the healing arts. Rather than relying on book study alone, a residency program achieves this result by involving the physician in day-to-day patient care and specialized clinical activities. Id., 487.

Residency program supervisors, like medical school professors, are responsible for evaluating a resident's progress and offering suggestions for improvement. See, e.g., D. Langsley, "Evaluation During Residency," in How to Evaluate Residents (J. Lloyd & D. Langsley, eds. 1986) pp. 11, 12. A residency committee's decision to dismiss a resident physician for poor performance in the clinic mirrors a professor's decision to fail a medical school student for poor performance in the classroom. See *Ross* v. *University of Minnesota*, supra, 439 N.W.2d 33 ("[t]he decision to terminate a resident from a hospital-based residency program is the same as any other decision to fail a graduate student for inability to meet academic requirements"). As Justice Powell observed in *Board of Curators* v. *Horowitz*, 435 U.S. 78, 95, 98 S. Ct. 948, 55 L. Ed. 2d 124 (1977) (Powell, J., concurring), "[e]valuation of . . . performance in

---

[12] The plaintiff does not allege that the hospital, for example, lowered his salary, eliminated his vacation times, or retracted his insurance benefits.

the [clinical] area is no less an 'academic' judgment because it involves observation of . . . skills and techniques in actual conditions of practice, rather than assigning a grade to . . . written answers on an essay question." We conclude, accordingly, that the hospital's decision to dismiss the plaintiff for poor clinical performance constituted an academic, rather than an employment, decision.

The plaintiff advances two reasons in support of his argument that his dismissal was nonetheless employment related. According to the plaintiff, the hospital is his employer, as a matter of law, because it controls his work and because it is not itself a part of a university, school or college. We disagree.

The plaintiff's first argument relies on "right to control" cases as evidence of his status as the hospital's employee. See *Silverberg* v. *Great Southwest Fire Ins. Co.*, 214 Conn. 632, 639, 573 A.2d 724 (1990). We have used the "right to control" test to distinguish between an independent contractor and an employee. See, e.g., *Hunte* v. *Blumenthal*, 238 Conn. 146, 154, 680 A.2d 1231 (1996); *Silverberg* v. *Great Southwest Fire Ins. Co.*, supra, 639. That test has no relevance, however, to the criteria for differentiation between a student and an employee. Indeed, it is a premise of the "right to control" test that what is at issue is the control of "the means and methods of work"; *Silverberg* v. *Great Southwest Fire Ins. Co.*, supra, 639; thus assuming the very point that is presently at issue.

The plaintiff's second claim is that the term "hospital"[13] cannot be defined to include "educational facility" and that the educational aspects of the residency program do "not change the hospital into a school, college,

[13] The plaintiff defines a hospital as "[a]n institution for the treatment and cure of sick, wounded, infirm or aged persons . . . ." See Black's Law Dictionary (6th Ed. 1990).

or university." Assuming the validity of this distinction, he argues that he could not have been a "student" at the hospital. We decline to accept the proposition that hospitals can never be educational facilities. In conducting the residency program in this case, the hospital assumed educational responsibilities related to, but distinct from, its function as an institution for healing the sick. The plaintiff concedes as much in his pleadings.[14] The fact that the hospital may be independent of a university system or may otherwise provide health services to the general public does not alter this conclusion. See, e.g., Training Physicians: The Case of Internal Medicine (C. Kohrman et al. eds., 1994) p. 284 (conducting study of residency programs in hospitals not affiliated with a medical school).

For all the reasons stated above, we hold that, in the circumstances of this case, the plaintiff's dismissal implicated the educational component of the residency agreement and was, therefore, an academic decision. In light of this conclusion, we must consider the merits of the plaintiff's other challenges to the validity of his dismissal.

## II

Even if his dismissal was properly grounded in academic reasons, the plaintiff maintains that, for three other reasons, the hospital's decision did not comport with its contractual obligations to him. In his view, the hospital: (1) failed to provide him with appropriate training; (2) discharged him arbitrarily, capriciously, or in bad faith; and (3) violated its obligation of good faith and fair dealing. Like the trial court, we are persuaded by none of these contentions.

---

[14] In paragraphs twenty and twenty-one of his amended complaint, the plaintiff alleges that the hospital failed to offer him a *"training program* that would reasonably and adequately train him" and failed to comply with the "standards established for *teaching hospitals.*" (Emphasis added.) See part IIA of this opinion.

## A

The plaintiff claims that the hospital, in breach of the residency agreement, failed to provide him a residency program that "would reasonably and adequately train him" and that was "in accordance with the standards established for teaching hospitals." The trial court recognized that this claim, as a matter of law, was consistent with the court's determination that the residency agreement manifested an educational undertaking, but concluded that, as a matter of fact, the plaintiff had not submitted evidence of disputed material facts sufficient to rebut the hospital's motion for summary judgment. We agree.

The plaintiff's claim that the hospital failed to provide him adequate training must be put into context. "Where the essence of the complaint is that [an educational institution] breached its agreement by failing to provide an effective education, the court is . . . asked to evaluate the course of instruction [and] called upon to review the soundness of the method of teaching that has been adopted by [that] educational institution." (Internal quotation marks omitted.) *Ross* v. *Creighton University*, 957 F.2d 410, 416 (7th Cir. 1992). This is a project that the judiciary is ill equipped to undertake. See id.; *Donohue* v. *Copiague Union Free School District*, 47 N.Y.2d 440, 445, 391 N.E.2d 1352, 418 N.Y.S.2d 375 (1979); *Cavaliere* v. *Duff's Business Institute*, 413 Pa. Super. 357, 370, 605 A.2d 397 (1992).

In reality, a claim such as that advanced by the plaintiff "raise[s] questions concerning the reasonableness of conduct by educational institutions in providing particular educational services to students—questions that must be answered by reference to principles of duty, standards of care, and reasonable conduct associated with the law of torts." *Cencor, Inc.* v. *Tolman*, 868 P.2d 396, 399 (Colo. 1994) (en banc). Because these tort

principles are difficult, if not impossible, to apply in the academic environment, courts have almost universally held that claims of "educational malpractice"[15] are not cognizable. Among other problems for adjudication, these claims involve the judiciary in the awkward tasks of defining what constitutes a reasonable educational program and of deciding whether that standard has been breached. See, e.g., *Peter W.* v. *San Francisco Unified School District*, 60 Cal. App. 3d 814, 825, 131 Cal. Rptr. 854 (1976) (finding no "conceivable 'workability of a rule of care' against which [teachers'] alleged conduct may be measured"). In entertaining such claims, moreover, courts are required "not merely to make judgments as to the validity of broad educational policies . . . but, more importantly, to sit in review of the day-to-day implementation of these policies." *Donohue* v. *Copiague Union Free School District*, supra, 47 N.Y.2d 445.

The jurisprudential considerations that shed doubt on the viability of the tort of educational malpractice also inform our analysis of a *contract* claim based on inadequate educational services. See *Ross* v. *Creighton University*, 740 F. Sup. 1319, 1331 (N.D. Ill. 1990), rev'd in part on other grounds, 957 F.2d 410 (7th Cir. 1992) ("the policies forbidding the tort of educational malpractice likewise forbid a breach of contract claim based upon allegedly inferior instruction"); *Paladino* v. *Adelphi University*, 89 App. Div. 2d 85, 89, 454 N.Y.S.2d 868 (1982) ("the soundness of [the] policy of noninterference is equally applicable when the action is . . . formulated in contract"). It is as a result of

---

[15] In educational malpractice cases, a plaintiff sues his or her academic institution for *tortiously* failing to provide adequate educational services; see, e.g., *Peter W.* v. *San Francisco Unified School District*, 60 Cal. App. 3d 814, 131 Cal. Rptr. 854 (1976); or for *tortiously* failing to diagnose educational impediments. See, e.g., *Hoffman* v. *Board of Education*, 49 N.Y.2d 121, 400 N.E.2d 317, 424 N.Y.S.2d 376 (1979); see generally, D. Morgan, "Liability for Medical Education," 8 J. Legal Med. 305, 307–15 (1987).

these considerations that contract claims challenging the overall quality of educational programs "have generally been rejected." *Cencor, Inc.* v. *Tolman,* supra, 868 P.2d 398; see also *Ross* v. *Creighton University,* supra, 957 F.2d 416; *Hunter* v. *Board of Education,* 292 Md. 481, 489–90 n.5, 439 A.2d 582 (1982); *Torres* v. *Little Flower Children's Services,* 64 N.Y.2d 119, 128, 474 N.E.2d 223, 485 N.Y.S.2d 15 (1984), cert. denied, 474 U.S. 864, 106 S. Ct. 181, 88 L. Ed. 2d 150 (1985); *Paladino* v. *Adelphi University,* supra, 89–90.

Judicial noninterference is especially appropriate in cases like the present one, in which the focus of a breach of contract claim is an allegedly inadequate residency program. See *Swidryk* v. *St. Michael's Medical Center,* 201 N.J. Super. 601, 606–607, 493 A.2d 641 (1985) (recognizing resident's claim for educational malpractice would infringe on administrative and legislative authority). Specialized bodies, such as the accreditation council for graduate medical education (accreditation council), currently have the responsibility of overseeing and regulating residency programs, including the one offered by this hospital. In this state, successful completion of a program accredited by the accreditation council is a prerequisite to obtaining a license to practice medicine and surgery. Public Acts 1995, No. 95-271; General Statutes § 20-13. In light of the highly specialized nature of patient care, these external regulators are better suited than are courts to evaluate the effectiveness of a residency program.

There are, however, at least two situations wherein courts will entertain a cause of action for institutional breach of a contract for educational services. The first would be exemplified by a showing that the educational program failed in some fundamental respect, as by not offering any of the courses necessary to obtain certification in a particular field. See *Wickstrom* v. *North Idaho College,* 111 Idaho 450, 452, 725 P.2d 155 (1986); *Ross* v.

*Creighton University,* supra, 957 F.2d 417. The second would arise if the educational institution failed to fulfil a specific contractual promise distinct from any overall obligation to offer a reasonable program. See, e.g., *Cencor, Inc.* v. *Tolman,* supra, 868 P.2d 399; *Paladino* v. *Adelphi University,* supra, 89 App. Div. 2d 92.

In this case, the plaintiff has neither alleged nor presented factual evidence of a fundamental failure on the part of the hospital's residency program. Rather, his claims fall into two categories: (1) general allegations of inadequacy; and (2) more specific allegations that the hospital failed to attain "the standards established for teaching hospitals." With regard to the first category, the plaintiff has done no more "than simply allege that the education was not good enough." *Ross* v. *Creighton University,* supra, 957 F.2d 416–17. This, in turn, is insufficient to state a cause of action. See id.; *Cencor* v. *Tolman,* supra, 868 P.2d 398. With regard to the second category, the hospital's alleged failure to live up to the promise contained in the residency agreement that the hospital "is, and will continue to be, properly accredited by all necessary accrediting authorities," the plaintiff failed to adduce, in the trial court, any evidence either that the hospital had lost its accreditation or that its accreditation was in serious jeopardy.[16]

We conclude, accordingly, that the trial court properly determined that the plaintiff's second claim was "without a factual basis" and, therefore, properly

---

[16] On appeal, the plaintiff contends that the accreditation council's allegedly poor evaluation of the hospital's residency program demonstrates that material facts were in dispute with regard to the hospital's maintenance of accreditation standards. The plaintiff never offered this evidence at trial, either in response to the hospital's motion for summary judgment or in conjunction with his motion for reconsideration of the trial court's decision granting summary judgment. Whatever its worth, this factual material, "raise[d] for the first time on appeal cannot be adequately explored at this stage of the proceeding." *Beechwood Gardens Tenants' Assn.* v. *Dept. of Housing,* 214 Conn. 505, 516, 572 A.2d 989 (1990).

granted summary judgment in favor of the hospital on this claim. See *Doty* v. *Mucci*, supra, 238 Conn. 805–806.

## B

The plaintiff further contends that his dismissal was improper, even as an academic decision, because the decision to terminate his residency resulted from arbitrary, capricious, and bad faith conduct by the hospital. The trial court rejected this claim, finding that the plaintiff had failed to allege or to offer evidence in its support. We agree.

As with the plaintiff's claim of deficiencies in his hospital training, we approach with caution, and with deference to academic decisionmaking, the plaintiff's challenge to the motivation of the hospital in terminating his residency. "Like the decision of an individual professor as to the proper grade for a student in his course, the determination whether to dismiss a student for academic reasons requires an expert evaluation of cumulative information and is not readily adapted to the procedural tools of judicial or administrative decisionmaking." *Board of Curators* v. *Horowitz*, supra, 435 U.S. 90; see also *Regents of the University of Michigan* v. *Ewing*, 474 U.S. 214, 225–26, 106 S. Ct. 507, 88 L. Ed. 2d 523 (1985); *Doherty* v. *Southern College of Optometry*, 862 F.2d 570, 576 (6th Cir. 1988), cert. denied, 493 U.S. 810, 110 S. Ct. 53, 107 L. Ed. 2d 22 (1989); *Lekutis* v. *University of Osteopathic Medicine & Health Services*, 524 N.W.2d 410, 413 (Iowa 1994); *Abbariao* v. *Hamline University School of Law*, 258 N.W.2d 108, 112 (Minn. 1977); *Olsson* v. *Board of Higher Education*, 49 N.Y.2d 408, 416, 402 N.E.2d 1150, 426 N.Y.S.2d 248 (1980); cf. *Mahavongsanan* v. *Hall*, 529 F.2d 448, 450 (5th Cir. 1976) (for dismissal grounded in disciplinary, rather than academic, reasons, courts appropriately may engage in more thorough due process analysis).

Judicial circumspection is particularly warranted in the context of academic decisions concerning medical competency. Put simply, "courts are not supposed to be learned in medicine and are not qualified to pass opinion as to the attainments of a student in medicine."[17] *Connelly* v. *University of Vermont & State Agricultural College*, 244 F. Sup. 156, 160–61 (D. Vt. 1965); see also *Jansen* v. *Emory University*, 440 F. Sup. 1060, 1063 (N.D. Ga. 1977), aff'd, 579 F.2d 45 (5th Cir. 1978) (per curiam); *Burke* v. *Emory University*, 177 Ga. App. 30, 32, 338 S.E.2d 500 (1985); cf. *Owens* v. *New Britain General Hospital*, 229 Conn. 592, 606, 643 A.2d 233 (1994) (judicial deference accorded hospital administration's decision to revoke staff privileges).

Educational discretion is, nonetheless, not limitless. The plaintiff properly observes that, in exercising its professional judgment, an educational institution does not have license to act arbitrarily, capriciously, or in bad faith. Such a substantial departure from academic norms may implicate substantive due process; see *Regents of the University of Michigan* v. *Ewing*, supra, 474 U.S. 224; or may constitute the breach of an educational contract by a private institution. See *Doherty* v. *Southern College of Optometry*, supra, 862 F.2d 577 (implicit in contract is promise not to act capriciously or arbitrarily); *Paulsen* v. *Golden Gate University*, 25 Cal. 3d 803, 808–809, 602 P.2d 778, 159 Cal. Rptr. 858 (1979) (en banc) (applying arbitrary and capricious standard to private school).

In the present case, therefore, the issue is not the jurisprudential basis for the plaintiff's claim but its fac-

---

[17] Medical malpractice cases, on which the plaintiff relies in arguing for greater judicial scrutiny, are distinguishable because, in those cases, the trier of fact judges a physician's performance against a standard of care based on a reasonably prudent health care provider. See General Statutes § 52-184c (a) (statutory standard of care for medical malpractice cases). Such an objective standard is irrelevant with respect to the dismissal of a

tual underpinning. The plaintiff bears a heavy burden in proving that his dismissal resulted from arbitrary, capricious, or bad faith conduct on the part of the hospital. To prevail, he must show that the hospital's decision had no "discernable rational basis." See *Holert* v. *University of Chicago*, 751 F. Sup. 1294, 1301 (N.D. Ill. 1990). To rebut the hospital's motion for summary judgment, the plaintiff was required, therefore, to provide an evidentiary foundation to demonstrate the existence of material facts in this regard.[18] See *Doty* v. *Mucci*, supra, 238 Conn. 805–806.

The plaintiff contends that the affidavit he submitted in opposition to the hospital's motion for summary judgment was sufficient to meet his evidentiary burden.[19] We disagree. Read liberally, the plaintiff's affidavit shows only that the plaintiff's performance was not so

resident who, in the *subjective* evaluation of his supervisors, is found to be incapable of completing his course of study.

[18] As the trial court noted, the plaintiff failed to allege that the hospital had acted arbitrarily, capriciously, or in bad faith. Normally, this failure would be sufficient to uphold the trial court's determination. See *Robert S. Weiss & Associates, Inc.* v. *Wiederlight*, 208 Conn. 525, 537, 546 A.2d 216 (1988). The plaintiff asserts, however, that paragraph twenty-four of his complaint, in which he alleges a breach of a covenant of good faith and fair dealing, constitutes sufficient pleading of his claim of arbitrariness, capriciousness, or bad faith. We will assume, for purposes of this discussion, that this lone paragraph is sufficient to plead his claim. See *O'Connor* v. *Dory Corp.*, 174 Conn. 65, 68–69, 381 A.2d 559 (1977) (construing allegations in light most favorable to pleader).

[19] In his brief, the plaintiff makes reference to the following "underlying facts," gleaned from his affidavit, which, he claims, show the alleged arbitrary, capricious, and bad faith nature of the hospital's decision to dismiss him: (1) the plaintiff was promoted through to the final year of the residency program and began his final year as chief resident; (2) the plaintiff was one of two residents selected to continue in the third year program; (3) from July, 1988, through the date of his dismissal in September, 1988, the plaintiff performed over 100 surgical procedures, at no time endangering the life or safety of any patient; (4) from July, 1988, through the date of his dismissal, the plaintiff did not receive any negative written or oral evaluations of his performance; and (5) in September, 1988, the hospital's general surgical section met and, without notice to the plaintiff, voted to dismiss him from the residency program.

deficient as to warrant his dismissal until the final year of his residency and that, in some respects, the plaintiff had performed satisfactorily up to that point. The plaintiff, in effect, asks us to conclude that a reasonable fact finder could have inferred from these observations that: (1) he was a qualified resident; and that, therefore, (2) the hospital's decision to dismiss him was based on caprice or motivated by bias.[20] We decline to construct such inferential bridges or to substitute the plaintiff's appraisal of his performance for that of the hospital. See *Haynes* v. *Hinsdale Hospital*, 872 F. Sup. 542, 545 (N.D. Ill. 1995) (plaintiff's difference in judgment with regard to her performance does not constitute genuine issue of material fact).

We conclude that the plaintiff failed to adduce material facts to survive a motion for summary judgment on his claim of arbitrariness, capriciousness, or bad faith on the part of the hospital. The trial court's decision to this effect must, therefore, be upheld.

C

The plaintiff's final claim is that the hospital, even in the exercise of its academic judgment, dismissed him improperly because his dismissal violated the hospital's implied covenant of good faith and fair dealing. The trial court, without explicitly addressing this claim,[21] determined that the hospital had been sensitive to the

[20] To the extent that the plaintiff is alleging that the hospital made its decision to dismiss him hastily and without proper procedural protections, this argument founders under the overwhelming weight of countervailing evidence. The hospital warned the plaintiff that his performance was deficient, placed him on probation to begin his fourth year, afforded him a hearing to challenge his dismissal, and then provided him with an internal appeals process. We cannot but conclude that "[t]he record unmistakably demonstrates [that the hospital's] decision was made conscientiously and with careful deliberation . . . ." *Regents of the University of Michigan* v. *Ewing*, supra, 474 U.S. 225.

[21] The plaintiff never requested an articulation from the trial court. See Practice Book § 4051.

plaintiff's shortcomings and had "set up elaborate procedural mechanisms to insure fairness" in the dismissal process. Accordingly, the trial court found that the hospital had not acted in bad faith. The plaintiff now contends that the "litany of bad faith actions" cited in his affidavit compels a reversal of the trial court's decision. We disagree.

The two principles that govern the plaintiff's claim are undisputed. "Every contract carries an implied covenant of good faith and fair dealing requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement." *Habetz* v. *Condon*, 224 Conn. 231, 238, 618 A.2d 501 (1992). "Bad faith means more than mere negligence; it involves a dishonest purpose." Id., 237.

In this case, the plaintiff has failed to articulate how an implied covenant of good faith and fair dealing provides greater protections than that afforded him under the arbitrary, capricious, and bad faith standard described in part IIB of this opinion. Even if a different argument theoretically could be mounted, we would, nonetheless, have to conclude that the plaintiff has failed to offer any independent evidentiary foundation to substantiate this claim. See *Doty* v. *Mucci*, supra, 238 Conn. 805–806.

The affidavit submitted by the plaintiff to rebut the hospital's motion for summary judgment fails to identify any material facts in dispute and fails to provide an evidentiary foundation in support of his claim of breach of an implied covenant of good faith and fair dealing. The plaintiff suggests that, by occasionally offering the plaintiff positive feedback and by delaying his dismissal until he had already been promoted to his fourth year, the hospital acted pursuant to some sinister motive. We discern no such malevolence. It is more plausible, by far, that the hospital's actions demonstrate its patience

and willingness to allow the plaintiff to overcome his performance deficiencies. We conclude, accordingly, that the trial court properly granted summary judgment in favor of the hospital on this claim.

The judgment is affirmed.

In this opinion the other justices concurred.