[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The above-captioned summary process action is one of four related cases involving related transactions that have been transferred to the complex litigation docket. These cases include a foreclosure action, claims for contractual remedies, and claims of legal malpractice. The first trial of the above case began in Stamford in December 2000 before The Honorable Kevin Tierney. On the third day of the trial, defendant Gerhard Hutter, who appeared as a pro se party as well as by counsel, filed a motion to recuse Judge Tierney. Judge Tierney denied that motion but then recused himself sua sponte, with the result that the case was mistried. All of the related actions were then assigned to the undersigned by the Administrative Judge for the Civil Division. Because trial of the summary process action had already been commenced, and because such proceedings are meant to proceed promptly, the court scheduled trial to commence on February 20, 2001. The defendants, Gerhard Hutter and his wife, Nance Hutter, had filed multiple defenses to the action, and presentation of the various issues took ten days of trial. The parties have filed post-trial briefs.
In his amended complaint, which is dated December 7, 2000, the plaintiff, Eugene Chimblo, alleges that he took title to the premises, a house on four acres of land at 993 Lake Avenue in an area of Greenwich known as "back country," on August 31, 1998, and that the defendants "unlawfully continued and have ever since continued in possession thereof from February, 1999 to the present." The plaintiff seeks a judgment for immediate possession and an order requiring the defendants to vacate the premises.
The defendants have asserted the following special defenses in their Amended Answer, Special Defenses, Set-off and Counterclaim dated December 13, 2000:
— lack of jurisdiction (First Special Defense);
 — the equitable doctrine of denial of relief to a party with unclean hands (Second Special Defense); and
 — the defendants rightfully occupy the premises (Third Special Defense).
CT Page 4472 In the first counterclaim, defendant Gerhard Hutter asserts that in the transaction in which the plaintiff acquired the deed to the property the plaintiff, along with two non-parties, Attorneys Douglas Milan and Vincent Liberti, had a fiduciary duty to Hutter "by virtue of [his] superior position in respect of evaluating the Premises, the Transaction and Limited Partnership and/or legal aspects related thereto." The first counterclaim also alleges that the plaintiff breached that fiduciary duty by
 A. Misrepresenting to Gerhard Hutter [his] own purposes as aforesaid;
 B. Failing to inform Gerhard Hutter of [his] purposes and plans as aforesaid; and/or
 C. Repeatedly failing to perform agreements made with Gerhard Hutter.
Both Gerhard Hutter and Nance Hutter assert as a second counter-claim that "12. Chimblo intended to benefit Gerhard and/or his wife Nance Hutter incident the foregoing [incorporating the factual allegations in the first counter-claim]" and that "13. Chimblo has been unjustly enriched incident the foregoing."
Findings of fact
The transaction at issue in this case arose from the Hutters' need to be rescued from the dire financial situation they were experiencing in 1997 and 1998. Though the Hutters were occupying a house with an indoor swimming pool on four acres of land in Greenwich, they testified that they were without liquid assets and had not been able to pay for fuel to heat their house during the winter. Nance Hutter had filed for bankruptcy, and her only asset was her interest in the residence at 993 Lake Avenue. The property was encumbered by at least one mortgage. Her husband, Gerhard Hutter, who described himself as an engineer engaged in his own business ventures to market a telecommunications invention, with no salaried employment, was a joint owner of the residence. The bankruptcy court, apparently after several years of proceedings, ordered the house to be sold at auction, and issued a notice to Mr. Hutter advising him that he could buy out his wife's interest by paying the bankruptcy trustee the amount bid by the highest bidder at the auction, $875,000.
Mr. Hutter received this notice dated July 9, 1998, and the deadline CT Page 4473 for the payment was August 3, 1998 at 5:00 p.m. The notice stated that if Mr. Hutter failed to exercise his right to buy at the auction price, he and Mrs. Hutter and their sons, then aged thirteen, nineteen and twenty-one, would have to vacate the premises on August 4, 1998, when the property would be conveyed to the party that had filed the $875,000 bid.
During the spring of 1998, the Hutters had been discussing their financial worries with a Greenwich lawyer, Douglas Milan. He did not enter an appearance in the bankruptcy proceeding; however, he answered questions that Mrs. Hutter asked him about the bankruptcy procedures, and he referred her to a lawyer in West Haven for advice. Mr. Hutter visited Attorney Milan to shown him a business plan, apparently for a new business venture or the resuscitation of an ongoing venture. Attorney Milan was aware that the Hutters' finances were so dire that they no longer had a car and that Mr. Hutter had been sued for nonpayment of tuition at the private school in which one or more of their sons had been enrolled. Mrs. Hutter called Attorney Milan frequently to describe each development in the bankruptcy case. The Hutters did not engage Attorney Milan as legal counsel, and he never billed them for his time.
The Hutters discussed with Attorney Milan their search for a lender who would provide them with financing so that they could rescue their home, which they believed to be worth far in excess of $875,000. Their own search for a lender was understandably unsuccessful, since it appears that they had no income and no asset other than their equity in 993 Lake Avenue. Attorney Milan explained the situation to the plaintiff, Eugene Chimblo, an elderly retired contractor who had been employed for forty years with his brothers in a family business in Greenwich. Mr. Chimblo, a neighbor of Attorney Milan, had retained the attorney in connection with his purchase of his son's home, which had been foreclosed by a bank. The court infers that Attorney Milan learned as a result of his representation of Mr. Chimblo that this elderly gentleman had substantial savings.
Attorney Milan took Mr. Chimblo to meet the Hullers and to see 993 Lake Avenue, with the idea that Mr. Chimblo's considerable savings and good credit standing would enable him to provide quick financing if a deal could be reached by which Mr. Chimblo could share in the investment advantage to be gained from obtaining clear title to the property, which would no longer be encumbered by the mortgage that was at issue in the bankruptcy proceedings.
Mr. Chimblo, a gruff octogenarian with an eighth grade education, testified that from the start the proposal that had interested him was a CT Page 4474 joint venture in which, in return for providing financing, he would share in the profits of selling the property. The Hutters testified unconvincingly that they believed that Mr. Chimblo was simply to loan them $875,000 and take a mortgage against the property, and that they were astounded when, with time running short at the end of July 1998, they were presented instead with a proposal that the parties enter into a contract by which such a loan would be part of a transaction in which Mr. Chimblo would obtain financing in a larger amount and the Hutters would agree that the property would be jointly owned and then sold after renovations, with the parties dividing the proceeds. The court finds that Mr. Chimblo never agreed to be involved in a transaction that would have required him simply to loan $875,000 to strangers with no income, no liquid assets, and no apparent plan for employment. The court finds, rather, that from the beginning Mr. Chimblo's proposal was to provide the cash necessary to allow Mr. Hutter to rescue the property from transfer to the auction bidder only if that transaction was part of a larger transaction to complete needed repairs to get the house ready for prompt sale and to divide the proceeds.
No evidence was presented that Mr. Chimblo had ever participated in such a venture before, and his prior real estate transactions were limited to those concerning his own residence or those of members of his own family. Mr. Chimblo spent much of the winter in Florida, though it appears that he returned to Greenwich frequently. The court finds that Mr. Chimblo is not a sophisticated person; that although he has experience as a building contractor, he has little experience with legal matters or paperwork; and that he entrusted all details of the transaction to Attorney Milan, whom he trusted to create documents that reflected the verbal discussions of the transaction.
While the Hutters engaged in frequent contacts with Attorney Milan, including many exchanges of documents by facsimile transmission from the dedicated fax line in their home, Mr. Chimblo left all details to Attorney Milan. Mr. Chimblo regarded Attorney Milan as his legal counsel, though he knew that Attorney Milan was also discussing the proposed transaction with the Hutters, who, as far as the evidence reveals had no other attorney in the summer of 1998.
Mr. Chimblo borrowed $875,000 against assets in his account at a stock brokerage firm and loaned that money to Mr. Hutter, who executed a mortgage in that amount to secure the loan. Using Mr. Chimblo's funds, Mr. Hutter met the August 3, 1998 deadline for redemption. At that point, Mr. Hutter had title to the house, free and clear of the mortgage that had been at issue in his wife's bankruptcy proceedings; however, he CT Page 4475 had no ability to pay the Chimblo mortgage note. The Hutters and Mr. Chimblo had not, as of August 3, 1998, reduced to writing the plan to renovate and sell the house and divide the profits.
Seeking to avoid having to enter into the deal that had been discussed, the Hutters continued to look for financing that would have allowed Mr. Hutter to pay off his $875,000 debt to Mr. Chimblo. Though Mr. Hutter believes that his lack of success was the product of conduct by Attorney Milan to undermine his overtures to mortgage brokers, the court finds that Mr. Hutter's irregular financial circumstances and litigation with past lenders were most likely the reason that he was not able to obtain a loan from any of the other sources he investigated.
In a July 14, 1998 facsimile transmission, Mr. Milan communicated a draft of a proposal on behalf of Mr. Chimblo. That draft proposed that Mr. Chimblo take title to the property and that it be renovated and sold, with Chimblo and the Hutters dividing the profits. On Mr. Chimblo's behalf, Mr. Milan searched for and located a lender, National Funding. It appears that he did not divulge to the prospective lender the actual plan, but created the impression that Mr. Chimblo was simply seeking a mortgage in aid of a purchase of the property. National Funding approved loans totaling $1,650,000, and a closing was scheduled for August 31, 1998. In aid of his search for financing, Mr. Milan asked Mr. Hutter and Mr. Chimblo to execute two documents (Exs. Z and 9) that were ostensibly contracts for the sale of the property. He explained that the sole purpose of the documents was to satisfy the requirements of prospective lenders to see the amount that was to be paid for the property, and that these documents were not intended by either party to form the actual basis of their transaction, which was instead to be the joint venture described above. The bogus contracts for sale identify different terms, one to be used if Mr. Chimblo applied for a residential mortgage, one to be used if he applied for a mortgage on the basis that he would buy the house for investment but not occupy it himself.
Between August 3 and August 31, 1998, the date for the closing that was based on the financing obtained by Mr. Chimblo, the Hutters continued without success to seek alternative financing. Had they succeeded, they could have paid off the $875,000 note to Chimblo. They were also free to refuse to enter into the proposed joint venture and simply leave Chimblo to his remedies to collect on the $875,000 note, a process that would have given them the additional time that would be required while a foreclosure action was pursued to judgment.
Attorney Milan, on behalf of Mr. Chimblo, and the Hutters, discussed CT Page 4476 features of the proposal as August 31 approached. While the Hutters did not see Mr. Chimblo's final proposal until the day of the closing, they had had the outlines of the proposal since July 14, 1998. (Ex. MMM). That proposal summarizes all of the salient terms, including the following terms:
 — Mr. Chimblo is to provide financing in the amount of $1,650,000;
 — "Hutter agrees that in return for providing the financing enumerated above Hutter will convey marketable title for the Property to Chimblo . . ." followed by conveyance to an LLC;
 — use of some of the money from the financing to renovate the house to put it on the market;
 — equal division of net proceeds upon sale of the property;
 — The Hutter family is allowed to occupy the property but must vacate it prior to the closing of the sale;
The court does not find credible the Hutters' claims of shock and surprise over the fact that the contract provided for a sale of the property to Mr. Chimblo, in view of the history of discussion of the deal.
The closing on August 31, 1998, was protracted. It began at about 10:00 a.m. and was not concluded until almost 5:00 p.m. During the closing, the Hutters left and conferred with an accountant whose office was across the street from National Funding's office. The Hutters were not represented by counsel at the closing, and it was very clear that Attorney Milan was acting as Mr. Chimblo's lawyer as the buyer. Attorney Milan had advised the Hutters in writing on July 14, 1998 (Ex. MMM) that he did not represent them, that Mr. Chimblo was his client in the transaction, and that they should review the terms with counsel.
After Mr. Hutter obtained title to the property on August 3, 1998, he had quitclaimed it to Nance Hutter. The court finds that this transfer was effectuated to protect the property from the possibility that lienors or judgment creditors would attach Mr. Hutter's interest. Since the contract prepared by Attorney Milan provided for a sale by Gerhard CT Page 4477 Hutter, at the August 31 closing Nance Hutter quitclaimed the property back to her husband, who then executed a deed in favor of Mr. Chimblo. National Funding, which had supplied $1,650,000, took a first mortgage. The mortgage proceeds were distributed as follows: $875,000 to extinguish the mortgage that memorialized Mr. Chimblo's loan to Mr. Hutter, $550,000 to Mr. Hutter, and the balance to be held in escrow by Attorney Milan for payment of renovations and mortgage payments for the period until the expected sale date. The escrowed amount was $159,543.84. The August 31, 1998 contract signed by the parties at the closing, Exhibit 2, is a poorly drafted document which does not contain explicit terms with regard to many features of the transaction. Because the exact wording of the agreement is crucial in analyzing the parties' claims, the text of the agreement is set forth in detail. The agreement provides in Section A as follows:
 Hutter agrees to sell and Chimblo agrees to purchase the real property known as 993 Lake Avenue, Greenwich, Ct. for the amount of $2,750,000. Said consideration to be paid as follows:
 1. CHIMBLO has provided GPH [Mr. Hutter] with $875,000 which is secured by a mortgage deed on the property.
 2. FINANCING: GPH AND Chimblo agree that Chimblo will provide financing in the amount of ONE MILLION SIX HUNDRED FIFTY THOUSAND DOLLARS ($1,650,000) for the following purposes:
 a. To provide $875,000 to pay-off Chimblo's mortgage on the property.
 b. To provide $50,000 more or less to pay for renovations to the Property as agreed to by the parties as listed on Schedule A.
 c. To provide $75,000 more or less to pay for all mortgage closing costs, including but not limited to mortgage points, title insurance, real estate taxes, real estate tax accruals, homeowner's insurance, In the mortgage amount or the replacement value as required by the mortgage company, attorney's fees, conveyance taxes, recording fees and all other costs associated with CT Page 4478 the closing costs.
 d. To provide $100,000 more or less to pay mortgage maintenance costs.
 e. To provide Gerhard Hutter with $550,000 plus any balance which may be available after payment of the monies detailed in paragraph c, which will be an advance against his portion of the net profits which will be realized from the sale of the property.
 f. Hutter agrees to pay any costs associated with the funds he is advanced from the financing, including, but not limited to interest, points, and closing costs, which sums are to be deducted from the proceeds of the sale of the property.
Though the first part of the agreement states that the sale is to "Eugene Chimblo, " Section B provided that: "GPH will convey title to the property to Chimblo d/b/a 993 Lake Avenue LLC, and the deed to the property shall be recorded in the name of 993 Lake Avenue LLC."
The agreement states that Chimblo "agrees to convey to N.H. [Nance Hutter] 50% of the ownership interest (stock) in 993 Lake Avenue LLC." The agreement further provided that Mr. Hutter would take a second mortgage in the amount of $1,100,000, and that he would release this mortgage "immediately upon conveyance of the stock to NH."
The agreement further provides that: "The Company will renovate and maintain the property with the intention of placing it for sale at a fair market value, not to be less than $2,750,000, on or before February 15, 1999." With regard to the sale, the agreement provides as follows:
"F. Chimblo[,] N.H. and GPH agree that they intend to sell the property at a fair market value. The listing price will be determined by choosing three real estate brokers specializing in luxury back country properties who will give their written opinions of the fair market value of the property to the company. The highest and lowest market values will be discarded and the middle price will be the price at which the property will be listed."
The parties further agreed that "the Listing real estate broker will be chosen by agreement of the shareholders," that the property would be CT Page 4479 listed for six months initially, and that it would be re-listed for a second six-month period if it failed to sell.
The agreement provides that upon sale, after payment of mortgages, liens, real estate taxes or other expenses associated with the closing, "the shareholders shall distribute the net proceeds as follows: 50% to Chimblo and 50% to NH."
The agreement further provides that "Chimblo, N.H. and GPH agree that the Hutter family will continue to occupy the premises until the closing on the sale . . . N.H. and GPH agree to reasonably cooperate with the personnel employed to renovate the property. GPH agrees that he and his family will vacate the property prior to closing." Additionally, the agreement provides for a payment to Attorney Milan "to reflect [his] participation . . . in bringing Chimblo and Hutter together and in facilitating the placement of the mortgage." The agreement states that "Chimblo and Hutter agree that each will cooperate with the other in effecting the intent of this agreement, including executing any instruments or other documents in furtherance of this agreement."
One of the terms of the agreement was thus that Mr. Hutter would receive a payment of $550,000 even before the property was sold, in effect, an advance payment of the hoped-for profits. The August 31, 1998 agreement provided that Mr. Hutter would convey title to the property to Mr. Chimblo. That transfer would enable Mr. Chimblo, with his good credit standing, to obtain a mortgage sufficient to replace his own loan of $875,000, to pay the $550,000 demanded by Mr. Hutter, make repairs sufficient to allow the house to be put up for sale, and to pay the mortgage payments for the period preceding the expected sale. The agreement identifies the amount of the mortgage to be obtained by Mr. Chimblo to be $1,650,000, an amount Mr. Chimblo borrowed from National Funding, a mortgage company. The intention, stated in the agreement, to put the property on the market by February 15, 1999, was keyed to the plan to pay mortgage payments from the proceeds of the mortgage between August and February. The monthly mortgage payment to National Funding was $14,391.11 (Ex. NNN).
The court is completely unconvinced by the Hutters' attempts to depict themselves as hapless innocents who were coerced into signing the August 31, 1998 agreement. Having avoided the loss of their home to the bankruptcy auction as a result of Mr. Chimblo's loan of $875,000, they no longer faced an imminent deadline in the summer of 1998. If they failed to enter into the agreement they had discussed with Mr. Chimblo, they were free to seek alternate financing, though they faced the prospect CT Page 4480 that he would eventually file a foreclosure action on the $875,000 mortgage. The court finds that the Hutters, with much experience in dealing with creditors, made a calculated choice to execute the August 31, 1998 agreement, thus gaining an immediate payment of $550,000 in cash, with no liability on the $1.65 million mortgage.
Though the agreement states that the property would be held by Mr. Chimblo "doing business as a limited liability company," no limited liability company had been created at the time of the closing on August 31, 1998. At the closing, it was clearly evident that the deed was being made out to Eugene Chimblo, not to Eugene Chimblo d/b/a 993 Lake Avenue LLC. Having agreed to loan $1,650,000 to Mr. Chimblo, National Funding was unlikely to agree that the collateral instead be deeded to a limited liability company.
Some days after the closing, the Hutters asked why no LLC had been created and no stock issued. Apparently, both the Hutters and Attorney Milan were under the mistaken impression that stock is issued in limited liability companies. Attorney Milan discovered that if title to the property were conveyed from Mr. Chimblo to an LLC, another transfer tax, in the amount of approximately $27,000, would be due. Neither the Hutters nor Mr. Chimblo was willing to pay this amount, nor to have such fees incurred jointly, which would reduce the eventual proceeds.
Attorney Milan took it upon himself to supervise the renovation of the house, hiring a roofer who had worked for a renovation business known as Blaire Residential Services, which Attorney Milan described as a business run by his fiance in which he sometimes played a role. The Hutters objected and insisted on using other contractors. They objected that the repairs to the driveway were defective because the asphalt was applied in cold weather in December, and they took the position that the house should not be put on the market until the paving company corrected the deficiencies in the spring of 1998 and until all the renovations that had been mentioned were completely accomplished to their satisfaction. Attorney Milan advised Mr. Chimblo that the repair budget of $50,000 had been exhausted, and that the funds available to make the monthly mortgage payments of $14,311.19 were running out. By late December 1998, most of the repairs had been completed.
The Hutters, living on the $550,000 they had received on August 31, 1998, made no move to put the house on the market, but traveled to the island of St. Barthelemy on vacation in late December and later traveled to Vienna. They took the position that the house could not be placed on the market because not all of the expected renovations had been completed CT Page 4481 to their satisfaction. They became difficult to reach by telephone or fax.
By telephone and in person, Attorney Milan requested that the Hutters cooperate in putting the house up. for sale.
Attorney Milan went in person to 993 Lake Avenue in early 1999 to urge the Hutters to cooperate in putting the house on the market. Mr. Hutter refused to let Mr. Milan enter the house. On one of these occasions, Mr. Hutter conversed with Mr. Milan from an open second story window above the front door. In April 1999, apparently on Attorney Milan's advice, Mr. Chimblo recorded an affidavit on the Greenwich land records which contained statements which differed from the actual terms of the agreement that he and the Hutters had signed. The document may have been based on an earlier draft of the agreement that was actually signed.
In the spring of 1999, the Hutters discovered this affidavit, took the position that they were being swindled, and refused to speak to Mr. Milan. They retained an attorney, Philip French, whom they had first consulted in September 1998, shortly after executing the agreement. Attorneys Milan, French and Alphonse DiBenedetto met with the parties on May 20, 1999, but the standoff continued.
On an unspecified day after May 20, 1999, Mr. Chimblo decided to proceed with putting the house on the market, and he showed up unannounced with a real estate broker. The Hutters' eldest son refused him entry to the house and told him to get off the property when Mr. Chimblo attempted to have the broker view the grounds. The court finds it highly improbable that the son did not realize who Mr. Chimblo was. When he told his parents of the visit, they made no effort to contact Mr. Chimblo. They did not offer to cooperate in pulling the house on the market.
Mr. Chimblo has made no payments on the mortgage after the proceeds from the $1,650,000 loans were exhausted, and a foreclosure action is pending. Mr. Chimblo seeks possession of the mortgaged premises in the hope of being able to effect a sale at market rates and pay off the mortgage notes. He testified that he intends to abide by his obligations to' divide the profits with the Hutters pursuant to the agreement.
On November 12, 1999, Mr. Chimblo served Gerhard Hutter and Nance Hutter with notices to quit the premises at 993 Lake Avenue. He also served a notice on "John Doe" to reflect the presence of the unknown young adult who had come to the door when Mr. Chimblo visited the property with the real estate broker. No evidence was presented to CT Page 4482 establish that any other adult was resident at the premises at the time the notices to quit were served.
Merits of the Summary Process Claim
The plaintiff seeks possession of the premises pursuant to Connecticut's summary process statute, Connecticut General Statutes Section 47a-1, et seq. That statute provides at Conn. Gen. Stat. §47a-23 (a) in pertinent part: "[w]hen the owner or lessor . . . desires to obtain possession or occupancy of any land or building . . . and (3) when one originally had the right or privilege to occupy such premises but such right or privilege has terminated . . . such owner . . . shall give notice to each lessee or occupant to quit possession or occupancy of such land [or] building . . . at least three days before the . . . time specified in the notice for the lessee or occupant to quit possession or occupancy." The plaintiff does not purport to be a lessor, rather, he claims to be the owner of the premises at issue. "Owner" is defined at Conn. Gen. Stat. § 47a-1 (e) as "one or more person, jointly or severally, in whom is vested (1) all or part of the legal title to property or (2) all or part of the beneficial ownership and a right to present use and enjoyment of the premises and includes a mortgagee in possession."
In order to be entitled to remedies under the summary process statutes, the plaintiff must establish both an ownership interest and that the defendants' right to occupancy has terminated. The defendants are mistaken in their view that summary process is available only in landlord-tenant situations. The present wording of § 47a-23, set forth above, defeats their contention. The fact that the statute has been used primarily in landlord-tenant situations does not negate the further scope of operation of the statute that is clearly set forth in the words of the statutes. It is a basic principle of statutory construction that a statute must be construed to give effect to all of its provisions. Elliotv. Sears. Roebuck Co., 229 Conn. 500, 512 (1994).
The plaintiff holds title to the property and is thereby an "owner";First Federal Bank v. Whitney Development Corp., 237 Conn. 679, 686-87
(1996); unless his ownership interest is invalid for one of the reasons raised by the defendants.
The Hutters claim that they are also owners under the provisions of the August 31, 1998 agreement, because Mr. Hutter is a mortgagee in possession, and because of their claims that the plaintiff fraudulently acquired his interest. They assert that if they have an ownership CT Page 4483 interest, summary process is not available against them. The words of § 47a-23 contain no such limitation. The statute does not require a plaintiff to be the sole owner, but specifically provides that summary process may be brought by "the owner," and the statutory definition includes those with a shared or partial interest, as quoted above.
The defendants also contest whether, under the circumstances, their right to continued occupancy has terminated.
It is well established that such issues are to be decided in the context of adjudicating a party's claim for remedies under the summary process statute. In The Southland Corp. v. Vernon, 1 Conn. App. 439, 443
(1984), the Appellate Court stated that "[t]he ultimate issue in a summary process action is the right to possession." See also Rosa v.Cristina, 135 Conn. 364, 365 (1949). Even if the issue of right to possession is complicated by claims concerning underlying contracts between the parties, these issues may be adjudicated in the context of the summary process action. The Southland Corp. v. Vernon, supra,1 Conn. App. 439. In Southland, the plaintiff's right to possession depended not simply on the terms of a lease, but on the terms of a franchise agreement. Though the trial court had ruled that such complications could not be adjudicated as part of the trial of the summary process complaint, the Appellate Court ruled to the contrary, noting that summary process is not to be held to be limited to simple transactions since it is no longer the province of justices of the peace, but is part of the regular civil docket of the Superior Court. Id., 445-450.
In the case before this court, however, the plaintiff does not claim his right to possession solely on the basis of his status as record owner of the property since the contract by which he took title in fact obligated him to convey title to another entity, a limited liability company to which title was not in fact conveyed. Mr. Chimblo's claim to possession is instead based on a right, derived from the August 31, 1998 agreement, to have the Hutters cooperate in readying the property for sale and to have them vacate the property in aid of a sale.[1]
The transaction reflected in the August 31, 1998 agreement is awkwardly conceived and its provisions are not well drafted. The essential arrangement reflected in it, however, was that the parties were entering into a joint venture to finance, renovate, and sell the property and divide the proceeds. The plaintiff was to take title to facilitate obtaining financing in aid of that joint venture. The mistaken impression that joint ownership could be reflected by issuance of equal shares of CT Page 4484 stock in a limited liability corporation was not one that was achievable in actuality; and the parties, by their conduct, abandoned that provision, and proceeded with the other features of the agreement, namely, the renovation of the premises in preparation for sale. The fundamental feature of the agreement was not joint ownership of title, but a division of the net profits from the sale of the property, which was expected to occur soon after the property was put on the market in February 1999. The court finds that while the Hutters initially acted in accordance with their obligations under the agreement to sell the house as a joint venture, in the winter of 1998-99 they decided instead to take advantage of the fact that only Mr. Chimblo had any obligation to pay the mortgage, and that the agreement had no definite date for them to vacate.
There is an implied covenant of good faith and fair dealing implicit in every contract, "requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement."Gupta v. New Britain General Hospital, 239 Conn. 574, 598 (1996), citingHabetz v. Condon, 224 Conn. 231, 238 (1992); see also Warner v. Konover,210 Conn. 150, 155 (1989).
The Hutters breached this duty by failing to act reasonably to cooperate with attempts by Mr. Chimblo, undertaken through Attorney Milan, to proceed with the plan to list and sell the house pursuant to the August 31, 1998 agreement. While the Hutters assert that Mr. Chimblo, as record owner, could simply have listed the house without their cooperation, he had no actual prospect of doing so while the Hutters were living in the house and could control whether real estate brokers could view the premises or show it to prospective buyers. They did not testify that they ever did anything to comply with their obligations concerning listing the house. Though they suspected that the man who had visited with a real estate broker was Mr. Chimblo, they did not call him to facilitate another visit. They refused to cooperate when Attorney Milan called and visited them to ask them to do so. The Hutters had shown by their conduct that they had no intention of cooperating, but that they would take the position that the transaction was in a stalemate, a condition that permitted them to live in a recently renovated home with no obligation to pay rent or share in mortgage obligations.
Mr. and Mrs. Hutter's demeanor at trial convinced this court that they have no intention of being either reasonable or cooperative, and that their mistaken view of their legal rights would make it impossible for the object of the agreement to be attained if they were still in CT Page 4485 residence in the house. When the Hutters signed the August 31, 1998 agreement they agreed to vacate the house in aid of the joint venture to renovate and sell it and divide the profits. They have received $550,000 in cash as an advance payment of their share of the anticipated proceeds as well as $875,000 with which they repaid the initial loan from Mr. Chimblo. They have not, however, acted in good faith to achieve the sale of the premises as they obligated themselves to do, and their continued occupancy makes the achievement of that result impossible.
The Hutters' conduct in failing to cooperate with the steps necessary to sell the house constituted a breach of the implied covenant of good faith and fair dealing in accomplishing the object of the contract they had signed. Under these circumstances, the plaintiff has a right of possession arising from the contract signed by the Hutters.
Sufficiency of the Notices to Quit
The Hutters take the position that even if the remedies provided in the summary process statute are applicable, the notices to quit issued on behalf of the plaintiff were insufficient because no separate notice to quit was directed to their second adult son. "As a condition precedent to a summary process action, proper notice to quit is a jurisdictional necessity." Lampasona v. Jacobs, 209 Conn. 724, 729 (1989). Connecticut General Statutes § 47a-23 (b) requires a plaintiff who knows, or whose attorney knows, of the presence of an occupant whose name is unknown, notice to quit may be directed to such occupant as "John Doe."
Connecticut General Statutes § 47a-26h provides that a summary process judgment is binding against
 "the named defendants and any minors holding under them" and "(3) if the plaintiff has properly named and served each occupant whose presence is known with a notice to quit and a writ, summons and complaint in accordance with the provisions of sections 47a-23 and 47a-23a, any occupant who first commenced occupancy of the premises prior to service of the notice to quit and (A) who the plaintiff and his agents did not know was in occupancy of the premises, or (B) of whose presence the plaintiff or his agent knew but whose name they did not know.
The evidence indicated that Mr. Chimblo had no idea that anyone other than Mr. and Mrs. Hutter and the young man who told him to leave the CT Page 4486 property was present in the house. The attorney who signed the notices to quit was not Attorney Milan, but Attorney Scott Harrington, who is employed by a law firm with no affiliation with Mr. Milan. He was not shown to have any knowledge of the occupants other than the facts known to Mr. Chimblo. Even if Attorney Milan's knowledge were somehow deemed relevant, he was aware that the Hutters had three sons, but no evidence was presented to prove that he knew that all three of the sons were residing in the property at the time the notices to quit were served or that he had told Mr. Chimblo. The evidence was to the effect that at the date of the service of the notices to quit, the Hutters' youngest son was under the age of eighteen, and the middle son was of college age. The Hutters did not testify unequivocally that the middle son actually resided in the house at the time of the notice to quit. The court finds that the plaintiff has properly complied with the statutory requirement by serving separate notices to quit on Mr. and Mrs. Hutter and on one "John Doe."
Merits of the Special Defenses
In their first special defense, the defendants assert conclusorily that the court lacks jurisdiction. The only issues raised with regard to this claim, that is, the applicability of the summary process remedies and the adequacy of compliance with the requirement to service notices to quit, are rejected in the discussion above.
The second special defense alleges that the plaintiff acquired title by fraud, and that his allegedly inequitable conduct should bar him from equitable relief. The court finds that this defense is unproven. Mr. Hutter signed over title to the property to the plaintiff with full understanding that the plaintiff could not obtain financing for the joint venture unless he owned title to the property. As this court has found above, the parties mutually agreed to abandon the provisions of the contract that required the property to be conveyed to a limited liability company when they realized that they would have to pay an additional transfer tax. No evidence was presented to establish that the plaintiff knew before the agreement was signed that the planned transfer was impracticable, and he has steadfastly asserted his intention to fulfill the agreement by dividing the net proceeds with Mr. Hutter upon sale of the property, the ultimate obligation the plaintiff undertook in the agreement.
Fraud is a "deception practiced in order to induce another party to part with property or to surrender some legal right." Billington v.Billington, 220 Conn. 212, 217 (1991). The Appellate Court has summarized CT Page 4487 the elements of a claim of fraud as follows:
 (1) that a false representation was made as a statement of fact; (2) that it was untrue and known to be untrue by the party making it; (3) that it was made to induce the other party to act on it; and (4) that the latter did so act on it to his injury.
Gravson v. Grayson, 4 Conn. App. 275, 287 (1985), appeal dismissed,202 Conn. 221 (1987). The court finds that the plaintiff fully intended to convey title to an LLC and that his attorney, through lack of familiarity with the legal requirements for LLC's, had no inkling that such a transfer would require the expense of another transfer tax. He had no obligation under the agreement to pay such an expense himself, and the Hutters were unwilling to pay it in whole or to split the cost. The element of knowing deception is unproven. Since the plaintiff has not sold the property and since no proceeds have been realized, the defendants likewise have not proven that they have suffered an injury.
The defendants have alleged that Mr. Chimblo owed them the duties of a fiduciary. Since the defendants have failed to prove either knowing deception or any injury, it is not necessary to differentiate in connection with this defense between the standard of proof of fraud applicable to fiduciaries and to non-fiduciaries.
In their third special defense, the defendants allege only the following sentence:
"Gerhard Hutter and the other defendants rightfully occupy the premises pursuant to the attached `Agreement' and/or subsequent acts of the parties thereto." This court has rejected this claim in finding that achievement of the purpose of the contract to which the defendants obligated themselves defeats their claim that the plaintiff is not entitled to possession.
The Counterclaims
Claim of violation of fiduciary duty
In their first counterclaim, the defendants claim that Mr. Chimblo owed the a fiduciary duty, and that he breached this duty (a) by misrepresenting his own purpose to Mr. Hutter; (b) by failing to inform Mr. Hutter of his purpose and plans; and (c) by failing to perform agreements made with Mr. Hutter. They allege that "[a]s a result of said CT Page 4488 breach, Gerhard Hutter has been defrauded by defendant Chimblo."
In this count, the defendants make the same claims against Attorney Milan and Attorney Vincent A. Liberti, who was attorney of record for the mortgagee, National Funding, at the closing. Neither of these individuals is a party in this action. Neither was served with a writ, summons and complaint in this action. Accordingly, the only claim before this court with regard to this count of the counterclaim is the claim that Mr. Chimblo, acting as a fiduciary, defrauded Mr. Hutter.
The first issue is whether Mr. Chimblo had a fiduciary relationship with Mr. Hutter. They were, as has been found above, business partners for the single venture that is at issue.
The existence of a fiduciary relationship is a factual issue. The Connecticut Supreme Court has ruled that `(r)ather than attempt to define `a fiduciary relationship in precise detail and in such a manner to exclude new situations,' we have instead chosen to leave `the bars down for situations in which there is a justifiable trust confided on one side and a resulting superiority and influence on the other.'" Dunham v.Dunham, 204 Conn. 303, 320 (1987), overruled in part on other grounds,239 Conn. 207, 213 (1997), quoting Harper v. Adametz, 142 Conn. 218, 225
(1955).
In Konover Development Corp. v. Zeller, 228 Conn. 206 (1993), the Connecticut Supreme Court considered the obligations of partners in a partnership in which each had an equal interest. Though one party inKonover had begun as a general partner and the other as a limited partner, the latter had acquired the interests of other limited partners and had an interest equal to that of the general partner at the time of the events at issue.
The Supreme Court noted that a partnership binds the parties in a fiduciary relationship, Konover Development Corp. v. Zeller, 228 Conn. 218, but recognized that all fiduciary relationships are not alike:
 The relationship between sophisticated parties in a business venture may differ from the relationship involving lay people who are wholly dependent upon the expertise of a fiduciary . . . "[E]quity has carefully refrained from defining a fiduciary relationship in precise detail and in such a manner as to exclude all new situations." Harper v. Adametz, 142 Conn. 218, 225
(1955). Simply classifying a party as a fiduciary CT Page 4489 inadequately characterizes the nature of the relationship.
Konover Development Corp. v. Zeller, supra, 228 Conn. 222-23.
In the context of complex commercial transactions between sophisticated parties with significant bargaining power, the Court stated, that neither the high standard of fiduciary protection required in Dunham v. Dunham,204 Conn. 303 (1987), nor a mere arm's length contractual posture applied:
 [W]e choose, instead, a middle ground that affords an appropriate degree of flexibility and deference to the parties' contractual arrangement as well as an appropriate degree of deference to their fiduciary relationship.
Konover Development Corp. v. Zeller, supra, 228 Conn. 222.
The court's reluctance to impose on one business partner the obligation to act in the interests of the other, even when to do so would be contrary to its own interest proceeds from a recognition of the nature of business transactions between parties of equal sophistication and bargaining power:
 We agree with the thrust of these commentaries that, in general, in the context of a commercial limited partnership the fiduciary relationship must be flexible enough to ensure that partners with diverse interests will be able to craft and rely on a partnership agreement that reflects their common interests. The law should recognize that an overly strict interpretation of partnership loyalty might stifle the limited partnership form, and enable a limited partner to exploit its status as beneficiary to hold a general partner hostage to the partnership. See II A. Bromberg L. Ribstein, [Partnership (1944)] § 7.01, p. 7:10. We also recognize, however, that an active general partner may use its position in the partnership for its advantage at the expense of a passive limited partner, and that, therefore, wise public policy counsels the retention of the fiduciary principle. We must search for a balance between flexibility and fidelity. CT Page 4490
Konover Development Corp. v. Zeller, 228 Conn. 227.
These observations are even more clearly applicable to a partnership like that presented in the instant case, in which neither party is a general partner and neither is a limited partner. Mr. Chimblo and Mr. Hutter were simply parties who had been brought together by an intermediary, and who endeavored to structure a transaction in a way that took advantage of Mr. Chimblo's good credit and that made it possible for Mr. Hutter's asset, the house, to serve as collateral for a loan, which Mr. Hutter could not obtain because of his past credit history and lack of income.
In such a situation of equal status between parties entering into a contract to achieve a joint purpose, this court has found that the partners owe each other a fiduciary duty only to interpret the contract in a manner consistent with achieving the agreed mutual purpose unless such a construction imposes on one party a burden not contemplated by the scope of the partnership agreement. Fusco-Long Wharf Associates LimitedPartnership v. SNET Real Estate Inc., Superior Court, judicial district of New Haven, Docket No. 93-0348751S (Jan. 12, 1994). The court finds that this construction of the fiduciary duty owed by one partner to an equal partner is appropriate in the instant case as well. Unlike the situation in Dunham v. Dunham, supra, there is no basis for any conclusion that Mr. Hutter depended on Mr. Chimblo in any way to protect his interests because of an familial relationship, influence, or dependence.
Mr. Chimblo's duty in the partnership or joint venture reflected in the August 31, 1998, agreement was therefore simply not to act in a manner that thwarted the progress toward the sale of the property and division of any profits. The court finds that Mr. Chimblo did not breach that duty.
Mr. Hutter alleges that Mr. Chimblo breached a fiduciary duty by failing to inform him of his purposes. This allegation appears to repeat the claim that Mr. Chimblo had an intention from the start to take title and never convey it to an LLC. The court has rejected this contention, finding that Mr. Chimblo and his counsel were unaware that the LLC structure was not viable. Contrary to Mr. Hutter's assumption, Mr. Chimblo did not assume a duty to pay for any and all unexpected additional costs. When both parties to the contract were unwilling to devote funds to paying a second transfer tax, they both tacitly agreed to complete the transaction without the conveyance to the LLC. Mr. Chimblo CT Page 4491 has shown himself to be ready, willing and able to proceed with the sale of the property, and the court finds that the evidence is clear and convincing that he has acted in accordance with what this court has found to be the limited fiduciary duties of a partner to the joint venture under the circumstances of equally unsophisticated parties.
The court finds for Mr. Chimblo as to the first counterclaim.
Unjust Enrichment
In the second counterclaim, both Mr. and Mrs. Hutter claim that Mr. Chimblo has been unjustly enriched.
In order to prevail on a claim of unjust enrichment, a party must prove that the other party was benefitted, that he unjustly did not pay for the benefit, and that the failure of payment was to the plaintiff's detriment. Hartford Whalers Hockey Club v. Uniroyal Goodrich Tire Co.,231 Conn. 276, 282 (1994). A remedy for unjust enrichment is available at equity when no remedy is available by an action on the contract. Id.; 5 5. Williston, Contracts (Rev. Ed.) § 1479.
The transaction at issue is memorialized in a written contract, for which an action for breach would be available if a breach had occurred. There is no occasion, therefore, for resorting to an equitable remedy when, if there were a breach, a remedy is available at law.
Even if, however, relief for unjust enrichment were seen to be an applicable remedy, the Hutters have not proven the elements of their claim. While Mr. Chimblo in fact acquired title to the property, the only possible rationale for characterizing this result as unjust is the term of the contract that provided for a transfer to an LLC. The property has not been sold, and Mr. Chimblo has certainly not been enriched by holding title until the purposes of the contract are achieved. He has steadfastly represented that he will honor his obligation to divide any net proceeds, precisely the result required under the contract. Mr. Chimblo paid for the benefit of his receipt of title by supplying the consideration specified in the agreement.
The Hutters have not proven the elements required to prevail on their second counterclaim.
Conclusion
For the foregoing reasons, the court hereby enters a judgment of CT Page 4492 possession in favor of the plaintiff. The execution shall not specify a date to vacate prior to May 8, 2001. Judgment shall enter in favor of the plaintiff on the defendants' counterclaims. The plaintiff shall recover his statutory court costs upon filing a bill of costs with the clerk and filing a request for adjudication.
Beverly J. Hodgson Judge of the Superior Court