[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON THE MOTION FOR SUMMARY JUDGMENT
The plaintiff; Astrid Clarke, filed a nine count complaint against the defendants, Bridgeport Hospital (the hospital) and David Baker, M.D. (Baker), director of Internal Medicine (collectively the defendants) on CT Page 8075 January 19, 2000. The plaintiff alleges that the hospital breached her residency contract, and that the defendants intentionally and negligently caused her severe emotional distress, and defamed her reputation. The defendants now move for summary judgment.
 Procedural History
The plaintiff filed her original nine count complaint on January 19, 2000. On February 8, 2000, the defendants filed a motion to strike the first, second, third, fourth, fifth, eight, and ninth counts of the complaint. On March 2, 2000, the court, Levine, J., granted the motion to strike as to counts eight and nine because those counts did not state a cause of action. The court ordered the plaintiff to file a revised complaint. At the hearing, the court specified which portions of the complaint the plaintiff should revise. Specifically, the court ordered the plaintiff to describe Baker's conduct in the third count and to attach a copy of the contract to the complaint. (Hearing Transcript, March 2, 2000, p. 33.) The plaintiff did not comply with the court's orders.
The defendants filed an answer on May 31, 2000, and a motion for summary judgment as to counts one, two, three, four, five, six, and seven of the complaint on July 26, 2000. The plaintiff filed a response to the motion for summary judgment on October 4, 2000. On October 5, 2000, the court, Lager, J., refused to hear argument on the motion for summary judgment because the plaintiff failed to comply with the court's order to file a revised complaint. Judge Lager ordered the plaintiff to file a revised complaint by October 19, 2000, in accordance with Judge Levine's previous order. The defendants were ordered to file an answer to the revised complaint by October 26, 2000.
The plaintiff filed a revised complaint on October 24, 2000. The revised complaint contained new counts, allegations, and exhibits. The complaint did not contain the revisions that were ordered by Judge Levine on March 2, 2000. The defendants filed a motion for judgment of nonsuit and an objection to the revised complaint. On December 7, 2000, the court, Levine, J., denied the defendants' motion for judgment of nonsuit and sustained the objection to the revised complaint. The court further ordered the plaintiff to attach a contract to the complaint and to request leave to amend the complaint. The plaintiff did not request leave to amend the complaint nor did the plaintiff filed a revised complaint in compliance with the court's previous orders of March 2, 2000. Accordingly, the court will refer to the plaintiff's original complaint, in deciding the motion for summary judgment as to counts one, two, three, four, five, six, and seven. CT Page 8076
In the first count of her complaint, the plaintiff alleges that as of June 1998 she had completed twenty months of training in the internal medicine program. The plaintiff alleges that she was eligible for graduation in early fall of 1999 based on the number of total months of training she had completed for internal medicine. The plaintiff also alleges that the contract she signed for the internal medicine program guaranteed graduation after thirty-six months of training. The plaintiff alleges that the hospital breached the contract(s) because the hospital refused to graduate her after thirty-six months of training in internal medicine. The plaintiff alleges that the breach of contract has caused damage to her reputation, loss of a job offer, loss of future employment, lost wages and other financial damages.
In the second count, the plaintiff alleges that the hospital's conduct in denying her the proper graduation date was extreme and outrageous, and that the hospital intended to inflict emotional distress upon her or proceed with reckless indifference to her rights. The plaintiff also alleges that the hospital's conduct was willful and malicious. In the third count, the plaintiff alleges that Baker's conduct was extreme and outrageous and that he intended to cause her severe emotional distress. The plaintiff claims that Baker's conduct was willful, malicious and with reckless disregard of her rights. The third count, however, fails to allege conduct by Baker to support the plaintiff's claims.[1]
The fourth count, brought against the hospital, and the fifth count, brought against Baker, contain allegations that the defendants knew or reasonably should have known that some or all of their conduct involved an unreasonable risk of causing emotional distress and that such distress might result in illness or bodily harm. The plaintiff claims that she has suffered severe emotional distress, upset feeling, depression, embarrassment, loss of self esteem, nervousness, sleeplessness, headaches and stomach discomfort as a result of the misconduct by the defendants. The fifth count fails to allege facts describing conduct by Baker that would support the plaintiff's claims.
In the sixth count, brought against the hospital, and seventh count, brought against Baker, the plaintiff alleges that the hospital and Baker made defamatory remarks concerning her ability to practice medicine to the American Board of Internal Medicine (ABIM), the Resident Review Committee for Internal Medicine, fellow faculty members, other hospital employees, and others. The plaintiff alleges that both the hospital and Baker stated that the plaintiff was incompetent to practice medicine and that these statements were false. The plaintiff claims that these statements were defamatory per se and that her reputation was damaged as a result. CT Page 8077
 Background Facts
The following facts are not in dispute and are taken from the briefs and supporting documentation. In the spring of 1995, the plaintiff was accepted into the Combined Internal Medicine-Pediatrics Residency Program (CIMPR) at Bridgeport Hospital. The CIMPR program trains doctors in two specialities, internal medicine and pediatrics. The scheduled duration of the CIMPR program is four years. Bridgeport Hospital requires the resident physician to sign a one year contract for each year of the residency program. The contract contains the terms and scope of the resident's employment and the requirements for successful completion of the program.
The plaintiff signed the first contract for the academic year beginning on July 1, 1995. After completing her first year, the plaintiff received a marginal evaluation in both internal medicine and pediatrics. The hospital renewed her contract for the 1996-97 academic year. During the 1996-97 academic year the plaintiff received another marginal evaluation in pediatrics and a satisfactory evaluation in internal medicine. In January 1997, the hospital made efforts to help the plaintiff improve her performance in pediatrics. The plaintiff was required to meet weekly for hour-long sessions with selected pediatric faculty and to work on-call with a senior resident. (Defendants' Brief; Exhibit D, p. 1.) The pediatric faculty expressed concerns about the plaintiff's deficiencies, which include disorganization in her approach to patient evaluation and presentation, difficulty staying focused on key problems, difficulty identifying critically ill infants, inability to make independent decisions, and inadequate leadership and supervisory skills. (Defendants' Brief, Exhibit D, p. 1.)
In April 1997, Michael Smith, M.D., the director of the CIMPR, issued a memorandum which made the renewal of the plaintiff's contract for her third academic year in the CIMPR program conditional on the plaintiff's acceptance of three requirements. (Defendants' Brief; Exhibit D, p. 2.) The plaintiff was required to: (1) repeat a specified portion of her second year rotations in pediatrics and complete closely supervised rotations in internal medicine; (2) accept and understand that she is having difficulty; and (3) seek professional psychological counseling to assist her in overcoming her maladaptive denial and emotional stress. (Defendants' Brief, Exhibit D, p. 2.) It was also indicated that the plaintiff's time in the CIMPR program would be closer to five years than the usual four years. (Defendants' Brief, Exhibit D, p. 2.) Additionally, the plaintiff was placed on probation for the remainder of the 1996-97 academic year and for the first two months of the 1997-98 academic year. (Defendants' Brief; Exhibit D, p. 2.) The plaintiff signed the memo from Smith on May 27, 1997, indicating her agreement with the CT Page 8078 requirements contained in the memo.
The plaintiff's contract was renewed for the academic year beginning on July 1, 1997. During this year, the plaintiff received a grade of unsatisfactory in pediatrics and maintained her satisfactory grade in internal medicine. Smith made the decision to terminate the plaintiff from the CIMPR program and it became effective on March 1, 1998. On February 23, 1998 the plaintiff filed a grievance with the hospital claiming that she was unfairly dismissed from the CIMPR program based on incorrect and incomplete evaluations. The decision was reviewed by Thomas Kennedy, M.D., chairman of the department of pediatrics, and Nicholas Dainiak, M.D., chairman of the department of medicine. Based on interviews and a review of the available information, Kennedy and Dainiak upheld the decision to terminate the plaintiff from the CIMPR program.
On March 31, 1998, the plaintiff initiated the second step of the grievance process, which consisted of a review of the decision by Karen Hutchinson, M.D., the director of Medical Education. Hutchinson also upheld the decision to terminate the plaintiff from the CIMPR program based on interviews and relevant information. The plaintiff requested that a panel be convened to review the decision. A panel, consisting of Robert Daly, M.D., chairman of the department of Psychiatry, Emily Blair, M.D., a member at large of the Medical Staff Executive Committee, and Robert Faizon, a resident in the Obstetrics and Gynecology Program, concluded that the grievance was related to a contract issue and they were unable to render a decision. (Defendants' Brief; Exhibit F, p. 4.)
The plaintiff referred the grievance to Bruce McDonald, M.D., the Senior Vice President for Medical Affairs for a final review. (Defendants' Brief, Exhibit F, p. 1.) During an interview with the plaintiff, McDonald asked the plaintiff to confine her comments to why she thought Smith's decision to terminate her from the CIMPR program was inappropriate. (Defendants' Brief; Exhibit F, p. 2.) The plaintiff reverted to the contract issues, and McDonald informed her that he would only discuss the issue of her disagreement with the performance evaluations and the subsequent dismissal from the CIMPR program because those were the issues upon which the grievance was based. (Defendants' Brief; Exhibit F, p. 2.) The plaintiff compared herself to other residents and stated that her performance was equal to their performance. (Defendants' Brief; Exhibit F, p. 2.) She became defensive when McDonald reviewed comments in her evaluations and claimed that the evaluation was inappropriate and that she had a number of defenses for each of the concerns expressed by faculty. (Defendants' Brief, Exhibit F, p. 2.) McDonald also discussed the decision by Smith to require her to repeat some of her second year pediatric rotations. (Defendants' Brief; Exhibit F, p. 2.) Although she had initially agreed to this requirement, CT Page 8079 the plaintiff refused to repeat her second year rotations because she felt she had done an adequate job and that it was not fair to require her to repeat her rotations. (Defendants' Brief; Exhibit F, p. 2.)
In his decision, McDonald states that "[i]t is apparent that Dr. Clarke does not accept the premise that the Program Director and members of the faculty responsible for her education are also responsible for supervision and assuring good medical care. The faculty indicated that they were not comfortable with the care she provided and did not feel that she could discern appropriately and make appropriate decisions, particularly in situations where there were critically ill patients on the Pediatric Service." (Defendants' Brief; Exhibit F, p. 2.) McDonald concluded "that the decision to terminate Dr. Clarke from a Combined Medicine/Pediatrics Program was the appropriate one. . . . Dr. Clarke's unwillingness to accept constructive criticism and her apparent inability to make sufficient efforts to correct her deficiencies left the faculty and the Program Director no choice but to terminate her from that program." (Defendants' Brief; Exhibit F, p. 3.) At the end of his decision, McDonald stated that "Dr. Clarke has a high degree of energy and is clearly committed to the practice of medicine. Efforts have been made to allow her the opportunity to complete a residency in Medicine at Bridgeport Hospital." (Defendants' Brief, Exhibit F, p. 3.)
Bridgeport Hospital offered the plaintiff a position in the internal medicine residency program as a second year resident. The plaintiff accepted the residency in internal medicine and signed a one year contract on June 29, 1998. The contract specifically provided that she was entering the Internal Medicine program as a second year resident. (Residency Contract, Academic Year July 1, 1998-June 30, 1999.) Furthermore, the plaintiff states in the complaint that the hospital offered her a second year position in Internal Medicine, which she accepted. (Complaint, Count One, ¶ 13.) Upon completion of the July 1998-June 1999 academic year, the plaintiff signed a contract for the academic year beginning in July 1999 and ending in June 2000. According to the contract, the plaintiff was a third year resident in the Internal Medicine Program. The plaintiff subsequently informed Baker that she considered herself eligible for graduation in October 1999 because she should have been credited with eight additional months when she entered the Internal Medicine Program. Baker and Hutchinson aver that the extra hours were completed during a probationary period and following the plaintiff's termination from the CIMPR program, the hospital was under no obligation to accept her into another program, much less credit her in any way toward its expedited completion. The plaintiff did graduate from the Internal Medicine Program in June 2000.
 Discussion
CT Page 8080
"Practice Book [§ 17-49] provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. . . . In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the non-moving party." (Citations omitted; internal quotation marks omitted.) Appleton v. Board ofEducation, 254 Conn. 205, 209, 757 A.2d 1059 (2000). "It is well settled that, for purposes of summary judgment, the moving party has the burden of showing the absence of any genuine issue [of] material facts which, under applicable principles of substantive law, entitle him to a judgment as a matter of law . . . and the party opposing such a motion must providean evidentiary foundation to demonstrate the existence of a genuine issue of material fact." (Emphasis in original; internal quotation marks omitted.) Gupta v. New Britain General Hospital, 239 Conn. 574, 582,687 A.2d 111 (1996). "Merely alluding to disputed material facts, however, without providing substantiation, does not sufficiently establish those facts to preclude summary judgment." Id.
The defendants move for summary judgment on the ground that there are no material facts in dispute and that they are entitled to judgment as a matter of law. The defendants argue that there is no issue of fact with regard to the residency contracts because the contracts provide the defendants with the absolute and sole discretion to evaluate her academic and professional development and to prohibit her from advancement or graduation as they deem appropriate. The defendants also contend that there is not an issue of material fact regarding whether the defendants' conduct in requiring the plaintiff to complete two years in the internal medicine program was extreme and outrageous. Additionally, the defendants argue that the plaintiff's defamation claims are based on comments that the defendants were contractually entitled and absolutely privileged to make with respect to the plaintiff's performance as a resident. The defendants provide as evidence in support of the motion for summary judgment a copy the CIMPR training program agreement, sworn affidavits of Baker and Hutchinson, a copy of a memorandum from Smith, a letter from the plaintiff to Baker, a copy of the resident training program agreement dated March 24, 1997, copies of memoranda from Bruce McDonald and Emily Blair, and a copy of the resident training program agreement dated February 1, 1999.
The plaintiff argues that the court should deny the defendants' motion for summary judgment because there are genuine issues of material fact in dispute. The plaintiff contends that she has provided evidence of contracts that guarantee graduation upon satisfactory completion of thirty-six months of training. The plaintiff claims that she has provided CT Page 8081 evidence that demonstrates that a material issue is in dispute regarding whether the defendants willfully, maliciously, and intentionally sought to embarrass, harm, threaten, prey on, defame and offend one of its own doctors. Based on such evidence of extreme and outrageous conduct by the defendants, the plaintiff argues that the defendants should not be granted summary judgment on the intentional infliction of emotional distress claim. The plaintiff also claims that the evidence shows that the defendants intentionally miscalculated material terms of her employment contract, acted in bad faith throughout her employment, caused her to lose a job offer, and set out to permanently damage her reputation in the community. Based on this evidence, the plaintiff asserts that whether the defendants knew or should have known that their conduct involved an unreasonable risk of causing emotional distress to her is an issue for the jury, and therefore, the defendants should not be granted summary judgment on the negligent infliction of emotional distress claim. Finally, the plaintiff urges the court to deny the defendants' motion for summary judgment on the defamation claims because the evidence shows that the defendants made malicious, defamatory statements with improper and unjustified motive. In support of the objection to the motion for summary judgment, the plaintiff's evidence consists of a copy the residency contract for July 1, 1997 to June 30, 1998, a copy of the ABIM summary of training and evaluation report, and a copy of a letter from David Baker dated July 13, 1999. The plaintiff, however, does not provide any counter affidavits.
 A. Whether Bridgeport Hospital Breached the Residency Contracts
"A residency training program provides medical school graduates with clinical training necessary for board certification in specialty or subspecialty areas. . . . A residency is, in many respects, part of an educational continuum begun in medical school. . . . The ultimate objective of the residency program is to educate the physician in the healing arts. Rather than relying on book study alone, a residency program achieves this result by involving the physician in day-today patient care and specialized clinical activities." (Citations omitted; internal quotation marks omitted.) Gupta v. New Britain GeneralHospital, supra, 239 Conn. 587. "Residency program supervisors, like medical school professors, are responsible for evaluating a student's progress and offering suggestions for improvement. . . . A residency committee's decision to dismiss a resident physician for poor performance in the clinic mirrors a professor's decision to fail a medical school student for poor performance in the classroom." Id.
The defendants have provided a copy of the relevant contracts in support of the motion for summary judgment. A review of the relevant contract language demonstrates that the plaintiff was not even guaranteed CT Page 8082 graduation from the program. The Residency Program at Bridgeport Hospital requires a one year contract between the hospital and the resident for each year of the residency. There were several contracts between the plaintiff and Bridgeport Hospital. The plaintiff claims that the contracts for the CIMPR program and for the internal medicine residency (the plaintiff refers to the CIMPR program and the Internal Medicine as the "first residency" and the "second residency" respectively in her complaint) guaranteed graduation after thirty-six months of training in the program.
"The intention of the parties to a contract governs the determination of the parties' rights and obligations under the contract. . . . Analysis of the contract focuses on the intention of the parties as derived from the language employed." (Citations omitted.) Levine v.Advest, 244 Conn. 732, 745, 714 A.2d 649 (1998). "Where the intention of the parties is clearly and unambiguously set forth, effect must be given to that intent. . . . Contract language is unambiguous when it has a definite and precise meaning concerning which there is no reasonable basis for a difference of opinion." (Citations omitted; internal quotation marks omitted.) Id., 746. "The rules of construction are applied only if the language of the contract is ambiguous, uncertain or susceptible of more than one construction. . . . Moreover, if the intention of the parties is to be determined without reference to extrinsic evidence, interpretation of the contract is a question of law." (Citations omitted.) Id.
The "first residency" began on June 30, 1995. The contracts for the first two years of the first residency were not submitted to the court. A residency contract for the academic year July 1997-June 1998 was provided to the court as evidence by both parties. The contract contains the following relevant language: "Any problems or deficiencies in the Resident's pefformance may necessitate retention at a particular level of training rather than promotion at a higher level, in the discretion of the program director." (Emphasis added.) (Defendants' Brief, Exhibit E, ¶ 14.) The contract also provides that "[t]he Resident shall be appointed to the Resident Training Program for a one year term. At the end of the first year term the Resident's appointment may be renewed by the Hospital for a second [year] and then subsequent year terms by the parties signing a new Resident Training Program Agreement for such year. The Hospital shall have the right to terminate a Resident at any time or fail to renew the appointment of a Resident if the Resident proves unacceptable to Hospital for reasons of health, patient safety, inadequacy of performance, failure to meet the criteria established for the Resident Training Program, violation of hospital policies and procedures or rules and regulations, violations of the terms of this agreement, or otherwise in the sole and absolute discretion of theCT Page 8083hospital." (Emphasis added.) (Defendants' Brief; Exhibit E, ¶ 15.) The contract does not contain any language guaranteeing graduation or eligibility for board certification after thirty-six months.
The plaintiff was dismissed from the CIMPR program in 1998. She filed a grievance with the hospital on February 23, 1998 and the decision to dismiss the plaintiff from the CIMPR was ultimately upheld. The hospital gave the plaintiff an opportunity to continue in the internal medicine residency program despite her dismissal from the CIMPR program. In May 1998, the plaintiff signed a new one year contract, beginning in July 1998 and ending in June 1999, for a residency in internal medicine. The evidence shows that the plaintiff agreed to enter the program as a second year resident and the contract and the recommendation of appointment to medical staff refers to the plaintiff as a PGY-II (second year resident). This contract contains the same language as the July 1997 — June 1998 contract. Although the letter of agreement, which is attached to the contract, shows that it usually takes thirty-six months to complete the program, it does not guarantee graduation from the program after thirty-six months. The last contract for the year July 1, 1999 to June 30, 2000 indicates that the plaintiff is a PGY-III (third year resident) and contains the same terms as the contracts discussed previously.
The language in the contracts is clear and unambiguous. The contracts give the hospital the discretion to renew or terminate a contract, and the program director has the discretion to retain the resident at a particular level of training. Contrary to the plaintiff's claims, the contracts do not contain language that guarantees graduation after thirty-six months.
In addition to the discretion specifically provided by these contracts, the Supreme Court has held that "[j]udicial circumspection is particularly warranted in the context of academic decisions concerning medical competency. Put simply, courts are not supposed to be learned in medicine and are not qualified to pass opinion as to the attainments of a student in medicine." Gupta v. New Britain General Hospital, supra,239 Conn. 596. "Education discretion is, nonetheless, not limitless. . . . [A]n educational institution does not have license to act arbitrarily, capriciously, or in bad faith. Such a substantial departure from academic norms may implicate substantive due process . . . or may constitute breach of an educational contract by a private institution." Id. The plaintiff has not provided any evidence that the decision to require her to complete two years in the Internal Medicine Program was an arbitrary decision by the hospital. The evidence shows that the hospital had valid concerns regarding the plaintiff's abilities. Ultimately, the plaintiff's performance resulted in dismissal from the CIMPR program. The CT Page 8084 hospital was not required to offer the plaintiff a residency in Internal Medicine following the dismissal, but the hospital did offer it, and the plaintiff accepted under the hospital's terms. Regardless of the plaintiff's claims to the contrary, the evidence shows that the hospital abided by the terms of the contracts.
The contracts establish that the hospital had the discretion to renew the plaintiff's contract or terminate the plaintiff from the program, and that the Program Director had the discretion to retain the plaintiff at a particular level of the residency training program. Additionally, the evidence submitted by the defendants demonstrates that the decision to terminate the plaintiff from the CIMPR program was within the discretion of the hospital and the decision to offer the plaintiff a second year position in the Internal Medicine program was within the hospital's discretion. The memo from Smith demonstrates the hospital made numerous efforts to help the plaintiff improve her performance and to stay in the CIMPR program. (Defendants' Brief; Exhibit D.) Smith states that "[f]aculty are very consistent in their concerns about Astrid's performance." (Defendants' Brief, Exhibit D.) The evidence shows that, despite the efforts by the hospital to help the plaintiff improve and remain in the CIMPR program, the plaintiff's "unwillingness to accept constructive criticism and her apparent inability to make sufficient efforts to correct her deficiencies left the faculty and the Program Director no choice but to terminate her from that program." (Defendants' Brief, Exhibit F, p. 2.)
The defendants' evidence also shows that the hospital decided to give her the opportunity to complete a residency in Internal Medicine. According to a letter to Baker on May 7, 1998, the plaintiff accepted the offer to work as a PGY-II (second year) for the academic year beginning July 1, 1998. Additionally, the contract for the academic year July 1998-June 1999 identifies the plaintiff as a PGY-II (second year) resident. Based on the evidence provided by the defendants, the court finds that the plaintiff accepted a second year position and the graduation date of June 2000 was appropriate.
The plaintiff has failed to provide the court with any evidence that supports her claim that the contracts guarantee graduation after thirty-six months, that the hospital breached those contracts, or that the hospital acted arbitrarily, capriciously or in bad faith. Accordingly, the court finds that the motion for summary judgment should be granted on the breach of contract claim. The hospital had the discretion to offer the plaintiff a second year residency in the Internal Medicine Program following dismissal of the plaintiff from the CIMPR program. Furthermore, the plaintiff agreed to these conditions by signing both the contracts for the academic years July 1998-June 1999 and July CT Page 8085 1999-June 2000.
C. Whether the Defendants Intentionally Inflicted Emotional Distress byExtreme and Outrageous Conduct
"In order for the plaintiff to prevail in a case for liability under . . . [intentional infliction of emotional distress], four elements must be established. It must be shown: (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." (Brackets in original; internal quotation marks omitted.) Appleton v. Board of Education, supra, 254 Conn. 210. "Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine . . . Only where reasonable minds disagree does it become an issue for the jury." Id.
"Liability for intentional infliction of emotional distress requires conduct that exceeds `all bounds usually tolerated by decent society'. . . . Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, `Outrageous!'" (Citations omitted.) Id., 210-11. "Conduct on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress." Id., 211.
The evidence submitted by the defendants demonstrates that the conduct by the defendants was neither extreme nor outrageous. As stated previously, the contracts submitted as evidence by both parties demonstrate that the defendants had the discretion to terminate the plaintiff from the CIMPR program. The evidence also shows that the decision by Smith to terminate the plaintiff from the CIMPR program was reviewed through a formal grievance process that was initiated by the plaintiff. (Defendants' Brief; Exhibit F, p. 1.) Several individuals determined that the evidence supported the decision to terminate the plaintiff. (Defendants' Brief, Exhibit F, p. 1.)
The evidence shows that the plaintiff continued to work in the Internal Medicine program despite the termination from the CIMPR program. According to the sworn affidavits of Baker and Hutchinson, "[d]uring the CT Page 8086 entire grievance review period, the Hospital allowed Dr. Clarke to continue her regular participation in the Internal Medicine program despite that Dr. Clarke had been formally terminated and the Hospital was under absolutely no obligation to do so. The Hospital even went one step further and agreed to accept her application to enter a separate residency program, the three-year Categorical Internal Medicine Residency Program. In fact, despite her poor performance in the CIMPR program, the hospital even offered — and Dr. Clarke agreed — that she would enter not as a regular first year resident, but would instead be considered a full second-year resident, requiring only two more years of satisfactory performance (starting July 1, 1998) in order to complete this ordinarily three-year program." (Defendants' Brief; Exhibit A, p. 36, ¶ 16; Exhibit B, p. 44, ¶ 16.) Overall, the evidence submitted by the defendants demonstrates that the defendants' conduct was reasonable under the circumstances.
In the brief in opposition to summary judgment, the plaintiff asserts that Bridgeport Hospital "a pinnacle of help and trust in the community, has willfully, maliciously, and intentionally sought to embarrass, harm, threaten, prey on, defame, and offend one of its own doctors." (Plaintiff's Brief; p. 16.) The plaintiff; however, provides no evidence to support this assertion. The plaintiff does not provide any counter affidavits to refute the evidence offered by the defendants in support of the motion for summary judgment. In fact, the plaintiff fails to allege any conduct by Baker in count three of the complaint much less conduct that could be considered extreme and outrageous.
"It is not enough . . . for the opposing party merely to assert the existence of such a disputed issue. Mere assertions of fact . . . are insufficient to establish the existence of a material fact and, therefore, cannot refute the evidence properly presented to the court [in support of a motion for summary judgment]." (Brackets in original; citations omitted; internal quotation marks omitted.) Mafucci v. RoyalPark Ltd. Partnership, 243 Conn. 552, 554-55, 707 A.2d 15 (1998). Accordingly, the court grants summary judgment as to counts two and three because the defendants have submitted evidence showing that their conduct was reasonable under the circumstances, and the plaintiff failed to establish that there was genuine issue of material fact as to whether the defendants' conduct was extreme or outrageous.
D. Whether the Defendants Negligently Inflicted Emotional Distress Uponthe Plaintiff
"The elements of negligent and intentional infliction of emotional distress differ as to the state of mind of the actor and not to the conduct claimed to be extreme and outrageous." (Emphasis added.) MunizCT Page 8087v. Kravis, 59 Conn. App. 704, 757 A.2d 1207 (2000). In order to state a claim for negligent infliction of emotional distress, the Supreme Court has concluded that "the plaintiff has the burden of pleading that the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that distress, if it were caused, might result in illness or bodily harm." Parsons v. United TechnologiesCorp., 243 Conn. 66, 88, 700 A.2d 655 (1997). In Parsons, the court determined that "negligent infliction of emotional distress in the employment context arises only where it is based upon unreasonable conduct of the defendant in the termination process. . . . The mere termination of employment, even where it is wrongful, is therefore not, by itself; enough to sustain a claim for negligent infliction of emotional distress. The mere act of firing an employee, even if wrongfully motivated, does not transgress the bounds of socially tolerable behavior." (Citations omitted; internal quotation marks omitted.) Id., 88-89.
Although the present case is not in the employment context, the same principles apply to the plaintiff's claims for negligent infliction of emotional distress. The defendants have provided evidence that demonstrates the hospital made every effort to help the plaintiff improve and remain in the CIMPR program. (Defendants' Brief, Exhibit D.) The evidence shows that the decision to terminate the plaintiff from the CIMPR program was reasonable based on the plaintiff's performance and her failure to correct her deficiencies. (Defendants' Brief; Exhibit F, p. 3.) The evidence also shows that the hospital offered the plaintiff a second year position in the Internal Medicine program and that the plaintiff accepted. (Defendants' Brief; Exhibit A, p. 36, ¶ 16; Exhibit B, p. 44, ¶ 16; Exhibit G, p. 1.) Additionally, the residency contract for the academic year beginning July 1, 1998, indicates that the plaintiff was a PGY-II (second year resident) when she entered the Internal Medicine program. (Residency Contract, Academic Year July 1998-June 1999, p. 1.) The plaintiff renewed the contract for the academic year beginning July 1, 1999, and she was a PGY-III (third year resident) according to this contract. (Defendants' Brief; Exhibit G, p. 1.) The evidence shows that the defendants' conduct was reasonable and in accordance with the residency contracts.
The plaintiff claims that the hospital breached the residency contract and refused to graduate her after thirty-six months of training in internal medicine. The plaintiff claims that this conduct caused her emotional distress and that the hospital and Baker knew or should have known that their conduct would cause her emotional distress. The plaintiff has not provided any evidence that shows the defendants' conduct was unreasonable or that it transgressed the bounds of socially tolerable behavior. The plaintiff has failed to provide any evidence that supports CT Page 8088 her claims that the defendants acted unreasonably or in a manner that is considered socially intolerable. Accordingly, the court grants summary judgment as to counts four and five.
E. Whether the Defendants Defamed the Plaintiff
The defendants are liable for defamation if the court finds "that the defendants published false statements that harmed the [plaintiff], and that the defendants were not privileged to do so." Torosyan v. BoebringerIngelheim Pharmaceuticals, Inc., 234 Conn. 1, 27, 662 A.2d 89 (1995). "There are two facets to the defense of privilege. The occasion must be one of privilege, and the privilege must not be abused. Whether the occasion is one of privilege is a question of law . . . [W]hether the privilege was abused . . . depends upon whether there was malice in fact . . . in uttering and broadcasting the alleged defamatory matter." (Brackets in original; internal quotation marks omitted.) Id., 28. "[C]ommunications between managers regarding the review of an employee's job performance and the preparation of documents regarding an employee's termination are protected by a qualified privilege. Such communications and documents are necessary to effectuate the interests of the employer in efficiently managing its business." Id., 29.
Just as communications between managers regarding the review of an employee's job performance are protected, the communications between doctors regarding a resident's performance are also protected. A residency program is part of a doctor's education, and therefore, evaluations are necessary not only to ensure that the resident is learning, but also that the resident is providing proper care and treatment to patients. Additionally, the plaintiff consented to evaluations of her performance by the defendants. The residency contracts provide that the resident will be reviewed every six months. "The Resident's performance shall be evaluated no less often than every six months. The Resident will meet with the Program Director (or his designee) periodically to review the Resident's performance." (Residency Contract, Academic Year, July 1998 — June 1999.) The letter of agreement, which is attached to the contract, states that the "evaluation process will be on-going and a form [will be] submitted to the Program Director for each rotation. Periodic review of these evaluations will be done with the resident throughout the year and any deficiencies noted with such reviews documented in the personnel file." (Residency Contract, Academic Year, July 1998-1999.) Accordingly, the defendants' statements regarding the plaintiff's performance were privileged communications.
Although the defendants' statements about the plaintiff were privileged, the defendants were not allowed to abuse the privilege. "Although a qualified privilege insulates many defamatory statements and CT Page 8089 shields many defendants from liability, the privilege does not protect a defendant who makes statements that are both defamatory and malicious."Gaudio v. Griffin Health Services Corporation, 249 Conn. 523, 545,733 A.2d 197 (1999). The privilege is abused if the defendants "made the statement about the plaintiff with actual malice — that is, with knowledge of its falsity or reckless disregard as to its truth." Torosyanv. Boebringer Ingelheim Pharmaceuticals, Inc., supra, 234 Conn. 29. "The plaintiff is required to come forward with solid circumstantial evidence of malice to overcome summary judgment." Kelly v. City of Meriden,120 F. Sup.2d 191, 199 (D.Conn. 2000).
In a Connecticut District Court case, the plaintiff alleged that the defendants had "made numerous statements charging [her] with lack of skill, mismanagement and general incompetence." (Internal quotation marks omitted.) Croslan v. Housing Authority for City of New Britain,974 F. Sup. 161, 170 (D.Conn. 1997). The court found that the plaintiff failed to "identify the specific subject matter of the statements, the times when the statements were made, and the context in which they were made." Id. The court held that "the plaintiff bears the burden of identifying the particular statements that she claims are defamatory. General assertions regarding speakers and subject matter are not sufficient to present a disputed issue of material fact regarding the actual defamatory statements that were made." Id., 171.
Similarly, in the present case, the plaintiff makes broad allegations that the defendants "made statements in the presence of the ABIM, the Resident Review Committee for Internal Medicine, fellow faculty members, other hospital employees, and others which included but was not limited to assertions that Dr. Clarke was incompetent to practice medicine." (Complaint, Sixth Count, ¶ 46.) The plaintiff alleges that the statements were false and malicious. (Complaint, Sixth Count, ¶¶ 47-49.) The plaintiff does not identify the specific statements that she claims were defamatory, she does not specify when the statements were made, or the context in which the statements were made.
The defendants' evidence demonstrates that neither the hospital nor Baker made defamatory remarks regarding the plaintiff's abilities. The affidavits of Baker and Hutchinson aver that the defendants did not "defame" the plaintiff. (Defendants' Brief, Exhibit A, p. 38, ¶ 19; Exhibit B, pp. 45-46, ¶ 19.) "Far from "defaming" her, Dr Clarke was completely aware when she started both programs and signed the contracts of the obvious fact that faculty members would be evaluating her performance, discussing the same with her and with each other, and relaying this information to the relevant certification boards. This includes the American Board of Internal Medicine, from which she sought certification and to whom, she realized, the Hospital would communicate CT Page 8090 assessments of her satisfactory completion of the same. Faculty and participants in residency programs throughout the nations generally understand that medical residency programs operate in this manner." (Defendants' Brief; Exhibit A, p. 38, ¶ 19; Exhibit B, pp. 45-46, ¶ 19.)
The evidence also shows that the hospital had valid concerns regarding the plaintiff's performance and that the plaintiff had difficulty accepting any criticism from her supervisors. "Despite repeated discussions with Astrid about her problems, she has had extreme difficulty in accepting any criticism as valid. From her perspective, she has not received timely feedback and her evaluations have not fairly assessed the scope of her work." (Defendants' Brief; Exhibit D, p. 1.) "It is apparent that Dr. Clarke does not accept the premise that the Program Director and members of the faculty responsible for her education are also responsible for supervision and assuring good medical care. The faculty indicated that they were not comfortable with the care she provided and did not feel she could discern appropriately and make appropriate decisions, particularly in situations where there were critically ill patients on the Pediatric Service." (Defendants' Brief; Exhibit F, p. 2.) Although the plaintiff had numerous difficulties with the CIMPR program, the hospital recognized that "Dr. Clarke has a high degree of energy and is clearly committed to the practice of medicine. Efforts have been made to allow her the opportunity to complete a residency in Medicine at Bridgeport Hospital." (Defendants' Brief; Exhibit F, p. 3.) The evidence shows that defendants were required to evaluate the plaintiff's performance not only as educators, but also to ensure the quality of care provided to patients.
The plaintiff did not refute the evidence provided by the defendants through counter affidavits or otherwise. The plaintiff did not submit affidavits from any of the individuals who purportedly heard the defamatory remarks made with regard to the plaintiff's ability to practice medicine. Additionally, the plaintiff did not submit any evidence that the hospital or Baker made defamatory remarks, or that the hospital or Baker abused the privilege. Accordingly, the court grants summary judgment to Baker on the sixth count and to the hospital on the seventh count.
 Conclusion
Based on the foregoing analysis, the court grants the defendants' motion for summary judgment as counts one, two, three, four, five, six, and seven. The plaintiff has not submitted any evidence that demonstrates there is a genuine issue of material fact. CT Page 8091
By the Court,
 Kevin E. Booth Judge of the Superior Court